NO. _____

TO THE

# COURT OF CRIMINAL APPEALS

### OF TEXAS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# CON MANH PHAM

Petitioner,

v.

# THE STATE OF TEXAS

Respondent.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PETITION FOR DISCRETIONARY REVIEW IN CAUSE NUMBER
07-14-126-CR FROM THE SEVENTH COURT OF APPEALS,
AND IN CAUSE NUMBER 62,289-C FROM THE
108th DISTRICT COURT OF POTTER COUNTY

\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# PETITION FOR DISCRETIONARY REVIEW

\*\*\*\*\*\*\*\*\*\*\*\*\*\*

John Bennett
Post Office Box 19144
Amarillo, TX 79114
Telephone: (806) 282-4455
Fax: (806) 398-1988
AppealsAttorney@gmail.com
State Bar No. 00785691
Attorney for the Petitioner

**THE PETITIONER REQUESTS ORAL ARGUMENT**

# TABLE OF CONTENTS

Index of Authorities .................................................................................3

Statement Regarding Oral Argument ...................................................5

Statement of the Case..............................................................................5

Statement of Procedural History...........................................................5

Ground for Review .................................................................................5

Is *Owens v. State*, 437 S.W.3d 584 (Tex.App. – Texarkana 2014, pet. granted), correct that a witness who "testifies as an expert regarding a defendant's competence to stand trial" and, by extension, regarding a defendant's sanity, "must be a licensed psychiatrist or psychologist and must satisfy a precise list of requirements"?

Argument ..................................................................................................6

Prayer for Relief.....................................................................................7

Certificate of Compliance ......................................................................8

Certificate of Service .............................................................................8

Opinion Below ........................................................... following page 8

# INDEX OF AUTHORITIES

Case

*Owens v. State*, 437 S.W.3d 584 (Tex.App. – Texarkana 2014,

   pet. granted) ................................................................................. 2,5-7

*Pham v. State*, __ S.W.3d __, 2015 WL 2375275 (Tex.App.

   – Amarillo, May 14, 2015) ............................................................ 5,7


Statutory Provisions

TEX. CODE CRIM. PRO. ANN. Art. 46B.022(a-b)

   (Vernon supp. 2014) ......................................................................... 6

TEX. CODE CRIM. PRO. ANN. Art. 46C.102(a-b)

   (Vernon supp. 2014) ...................................................................... 6-7


Rule

TEX. R. APP. P. 66.3(a) .......................................................................... 6

NO. _____

TO THE

# COURT OF CRIMINAL APPEALS

OF TEXAS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# CON MANH PHAM

Petitioner,

v.

# THE STATE OF TEXAS

Respondent.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PETITION FOR DISCRETIONARY REVIEW IN CAUSE NUMBER
07-14-126-CR FROM THE SEVENTH COURT OF APPEALS,
AND IN CAUSE NUMBER 62,289-C FROM THE
108th DISTRICT COURT OF POTTER COUNTY

\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# PETITION FOR DISCRETIONARY REVIEW

\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**To the Honorable Judges of the Court of Criminal Appeals:**

COMES NOW Con Manh Pham, petitioner, and submits this petition in support of his request for remand of this cause to the court of appeals for new analysis.

4

## STATEMENT REGARDING ORAL ARGUMENT

Since two courts of appeals conflict on the issue raised – which is also a matter of first impression – the petitioner requests oral argument.

## STATEMENT OF THE CASE

The petitioner pled not guilty to a charge of murder, but was convicted by a jury, which subsequently assessed a sentence of thirty years' imprisonment.

## STATEMENT OF PROCEDURAL HISTORY

The Seventh Court of Appeals affirmed the conviction and sentence in a published opinion on May 14, 2015. *Pham v. State*, __ S.W.3d __, 2015 WL 2375275 (Tex.App. – Amarillo, May 14, 2015). A copy of the ruling is attached to this Petition. No motion for rehearing was filed.

## GROUND FOR REVIEW

Is *Owens v. State*, 437 S.W.3d 584 (Tex.App. – Texarkana 2014, pet. granted), correct that a witness who "testifies as an expert regarding a defendant's competence to stand trial" and, by extension, regarding a defendant's sanity, "must be a licensed psychiatrist or psychologist and must satisfy a precise list of requirements"?

# ARGUMENT

The decision of the court below "conflicts with another court of appeals' decision on the same issue." TEX. R. APP. P. 66.3(a).

Under TEX CODE CRIM. PRO. ANN. Art. 46B.022(a-b) (Vernon supp. 2014), a mental health professional appointed to evaluate competence to stand trial must meet several specific qualifications. *Id*. The corresponding provision regarding appointment to do insanity evaluations is similar. TEX. CODE CRIM. PRO. ANN. Art. 46C.102(a-b) (Vernon supp. 2014).

The Sixth Court of Appeals has recently concluded that under Art. 46B.102, expert witnesses *testifying* at competency hearings must also meet the qualifications required for appointment to determine competence:

> A person who testifies as an expert regarding a defendant's competence to stand trial must be a licensed psychiatrist or psychologist and must satisfy a precise list of requirements.

*Owens*, 437 S.W.3d at 586-7.

Here, as the court of appeals noted, the court-appointed expert testified the appellant was insane at the time of the act for which he was tried. (Opinion, attached, p. 7). But the State hired its own expert who did not meet the qualifications of Art. 46C.102(a-b), and who – over the appellant's objection to that effect – testified the appellant was sane. (Opinion, p. 9). The jury convicted the appellant, implicitly rejecting his plea of insanity.

6

On appeal the petitioner raised the matter of the State's expert's qualifications under Art. 46C.102(a-b). But the court of appeals, while noting that the State's expert did not meet several of Art. 46C.102's qualifications, did not construe that provision in the manner of *Owens*, to require expert witnesses other than those appointed thereby to meet its qualifications:

> Neither Article 46C.107 itself nor any other provision in the code appears to apply Article 46C.102's specific qualifications to an expert of the defendant's own choice.

(Opinion, p. 10, 12-13). Discretionary review is desirable to address the conflict. Rule 66.3(a), *supra*.

## PRAYER FOR RELIEF

The petitioner therefore prays the Court grant discretionary review and remand the case to the court of appeals for a harm analysis, or grant all appropriate relief.

Respectfully submitted,

/s/ JOHN BENNETT
John Bennett
Post Office Box 19144
Amarillo, TX 79114
Telephone: (806) 282-4455
Fax: (806) 398-1988
Email: AppealsAttorney@gmail.com
State Bar No. 00785691
Attorney for the Petitioner

## CERTIFICATE OF COMPLIANCE

I certify that this entire PDR contains 965 words.

/s/ JOHN BENNETT
John Bennett

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above and foregoing PDR has been served by prepaid U.S. Mail, first class delivery prepaid, on Jack Owen, Esq., Assistant District Attorney for Potter County, by email to him at jackowen@co.potter.tx.us, and on Lisa McMinn, Esq., State Prosecuting Attorney, by United States Mail, first class delivery prepaid, to her at P.O. Box 13046, Austin, Texas 78711, and by email to her at lisa.mcminn@spa.texas.gov, all on June 15, 2015.

/s/ JOHN BENNETT
John Bennett

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-14-00126-CR

CON MANH PHAM, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

On Appeal from the 251st District Court
Potter County, Texas
Trial Court No. 62,289-C, Honorable Ana Estevez, Presiding

May 14, 2015

OPINION

Before CAMPBELL and HANCOCK and PIRTLE, JJ.

Appellant, Con Manh Pham, appeals the trial court's judgment by which he was convicted of murder and sentenced to thirty years' imprisonment.[1] On appeal, he challenges the legal and factual sufficiency of the jury's rejection of his insanity defense and the qualification of the State-sponsored psychiatric expert. We will affirm.

---

[1] *See* TEX. PENAL CODE ANN. § 19.02(b) (West 2011).

Factual and Procedural History

<u>The Day of the Murder</u>

On the morning of September 10, 2010, Dinh Pham[2] came to his church, Our Lady of Vietnam Church, to continue his volunteer work of painting areas of the church. Between 10:00 and 11:00 that morning, appellant, also a member of the congregation, came to the office of the church's pastor, Father John Tran Tinh, and asked for his prayers due to appellant's failing health. Appellant and Father John talked for about ten minutes; the two had what Father John described as a "very normal conversation."

At the suggestion of Father John, appellant joined Dinh in the church basement where Dinh was painting the children's Sunday school rooms. For some time, it seems, the two may have been painting together. However, at some point, the collaboration turned deadly. While the two men were in the basement together, appellant stabbed Dinh several times, sliced his throat, and placed his body on a piece of cardboard in a spread eagle-type pose. Then, appellant called 911 at approximately 1:30 in the afternoon.

Through a translator, the 911 operator was able to understand that there had been a stabbing at the Our Lady of Vietnam Church. The caller, identified as appellant, reported that another man had stabbed him and that he had stabbed that man in return. Police were immediately dispatched to the church.

_____

[2] The record indicates that appellant and Dinh Pham were unrelated. Because appellant and the victim share the same surname, though, we will refer to Dinh Pham as "Dinh" to avoid the possibility of confusion. Likewise, we later refer to appellant's brother by his first name, "Cang."

2

First to arrive was Corporal Darrell Roberts, who encountered appellant as he came out the side door of the church. Appellant was in a "distraught" state, flailing about and falling to the ground as he held his leg, which showed to have a small amount of blood on it. Roberts communicated as best he could with appellant for a moment, and appellant gestured to him in such a way as to direct Roberts's attention inside the church. Thinking that he was going inside to search for the suspect and that appellant was the apparent victim of the reported stabbing, Roberts went inside the church, joined by another officer who arrived shortly after Roberts. The officers searched each ground level room only to find no one. Then, they discovered Dinh's body lying on the floor in the basement. Roberts radioed upstairs to the several other officers who had, by then, responded to the location, indicating that appellant was now the suspect and should be detained.

Sergeant Raquel Saunders, who was staying with appellant upstairs in the church's dining hall, was unable to decipher the garbled radio transmission from the basement. She continued her interaction with appellant, still the apparent victim, whose behavior and mannerisms were, by Saunders's account, somewhat "odd" considering that his wounds were far from severe. Saunders explained that, during much of her interaction with appellant, appellant remained lying flat on his back and would sometimes only lift up his head to speak or gesture to her. She described him as cooperative, however, and noted that he made no attempt to flee.

Ultimately, the wounds to appellant's leg were minor, but, at the time, he was transported to the hospital, where he was interviewed by Sergeant Paul Buckles of the Potter County Sheriff's Department, a member of the Criminal Investigation Division.

3

Appellant repeatedly reported to Buckles that Dinh had stabbed him, so appellant stabbed him back. During the time immediately after the murder, appellant never wavered from this self-defense scenario to describe the interaction between appellant and Dinh leading up to Dinh's death.

Appellant's Behavior Leading up to the Murder

From the record, we learn that appellant has had a rather long history of suffering from mental illness. For many years, he was under the care of a doctor and was prescribed medications that would greatly improve his mental and physical well-being. We learn, too, that appellant stopped taking his medication in the months leading up to the murder and that, at the moment he stopped taking them, his mental and physical health began to deteriorate, a fact that family members noted.

Appellant's mother, Tran Dao, testified that her son lived with his wife and child nearby, but she saw him on a daily basis and he would sometimes stay at her house. He stayed at her house rather frequently during the summer of 2010, in the months preceding the murder. He would stay for a few days and then return to his home for a while. During the times appellant would stay at his mother's house, she noted that he was not well and observed his increasingly erratic behavior. Dao described an incident during which appellant destroyed her couch with a hammer after explaining that he did not like it any longer and, consequently, had to destroy it. She described him as looking very strange during that episode. She also described an incident during which appellant cut down a tree in her front yard despite her protests and despite the fact that there was nothing apparently wrong with the tree. She explained that both she and another of her

4

sons tried unsuccessfully to dissuade him from doing so. She also explained that appellant was afraid of something and, out of fear, covered over all the windows of her house with newspaper. Appellant told her that he was afraid someone would see him and do him harm. Appellant also installed a security camera in her home, but, when he suspected someone had tampered with it, he destroyed the camera by throwing it on the floor. Dao also testified as to appellant's obsession with washing his clothes repeatedly and his growing suspicion that someone—perhaps his brother and/or his wife—was poisoning his food. He would often refuse to eat and, as a result, grew thinner and weaker throughout the summer. Dao explained that when appellant was taking his medication, he looked healthier and acted normally, but, when he did not, he looked "very weird" and could not work.

On the morning of the murder, appellant came to Dao's house to drop off his son for her to watch while he went somewhere. Dao described him as looking "very sick and very weak" that morning. His behavior was "abnormal," and he told her he was going to go to the doctor. She encouraged him to begin taking his medication again.

Appellant's brother, Cang Pham, also testified that, when appellant would cease taking his medication, he would become ill and would often stay at the house with him and their mother. He, too, described appellant as "weak" and not doing well in the weeks before the murder. Cang testified that, at times, appellant would sit alone and simply smile to himself. He also described how appellant covered all the windows in newspaper. In fact, appellant's appearance and demeanor became so worrisome that Cang called the police to seek help in how to get appellant back on his medication. Either the police or another source directed Cang to application paperwork that would

5

initiate a commitment proceeding by which appellant might be hospitalized. Shortly before the murder, Cang got the application, but, because of a language barrier, was unable to complete that application before the murder occurred. Cang also urged appellant to go back to his doctor who had been treating appellant's mental illness for years, but appellant refused. A month or two before the murder, Cang scheduled an appointment for appellant with a new doctor, but, again, appellant refused to go.

Appellant's wife, Minh Nguyen, also testified about appellant's behavior in the months preceding the murder. She testified that, after working at his job for over ten years, he quit in March 2010 but returned to that job in August 2010, weeks before the murder. His return to work served to accelerate his physical and mental deterioration, according to Nguyen. She testified that he slept very, very little, and, when he did sleep, he would wake up in the night to wash his feet, telling her that he feels like there was something inside them causing him to itch.

Much like appellant's mother, Nguyen reported a distinct difference between appellant's behavior and appearance when he was properly medicated and when he was not. She testified that he would wear scarves during the hot summer months before the murder. On a whim, he also took a trip to France in July 2010. Nguyen also noticed that appellant would repeatedly wash his clothes. Appellant would frequently hear people inside the house, which caused him a great deal of fear. He also voiced his suspicion to her that their next-door neighbors were hiding dead bodies in their garage.

She testified, too, that appellant treated her meanly during the months preceding the murder, having become both verbally and physically abusive. She described a time

6

when appellant, displeased with something related to their son's clothing, gave her a black eye by striking her in the face so hard that it knocked her to the ground. After he struck her, he went to lie down for about fifteen minutes, and then he came and apologized to her. Prior to that incident, appellant had never struck her and had not been violent toward anyone else in the years that she had known him. Nguyen called the police that day to try to get help in getting appellant back on his medication. Nguyen testified that appellant believed at times that she was poisoning his food; he would often refuse to eat and lost a lot of weight. The morning of the murder, appellant spoke with Nguyen about the poisoning and discussed divorce. Nguyen made clear that she thought her husband was mentally ill, characterizing him as "a sick man."

Expert Testimony on Appellant's State of Mind, Sanity

The trial court appointed Steven C. Schneider, Ph.D., a neuropsychologist, to conduct an examination on appellant to determine whether appellant was sane or insane at the time of the offense. Schneider examined appellant a little over a year after the incident, after appellant had been medicated. Schineider's testing revealed that appellant had "a significant executive function impairment" as evidenced by imaging of his brain's frontal lobe activity, an impairment which would result in him having less self-control. Based on this "severe frontal lobe impairment," Schneider testified that, unmedicated, appellant would likely experience "some tremendous confusion and distortion." Citing appellant's paranoid schizophrenia, his frontal lobe impairment, and appellant's explanation that he believed that Dinh was a demonic cannibal, Schneider concluded that, at the time of the offense, appellant was not able to distinguish right from wrong and was, therefore, legally insane. Schneider testified that appellant

7

believed that Dinh was going to eat him and stabbed Dinh to prevent him from doing so. In an anachronistic narrative, appellant explained to Schneider why he thought Dinh was a cannibal: appellant saw Dinh the day after the murder when Dinh threw something—perhaps something resembling human remains—in the garbage can while drinking a beer. Schneider explained that, during the examination, the more lucid appellant, who did express remorse for the murder during the evaluation, was aware that his thoughts at the time were confused and disjointed.

Schneider discounted appellant's initial reports that he killed Dinh in self-defense—and his attendant silence regarding his suspicions that Dinh was a cannibal—as appellant's attempts to adjust his behavior and thought pattern to society's norms, to avoid a negative reaction to his suspicions. Schneider expressed a reluctance to interpret appellant's story immediately after the murder as indicative of appellant's ability to distinguish right from wrong. Schneider also declined the invitation to take appellant's apology for striking his wife days before the murder as indicative of appellant's ability to distinguish right from wrong at the time of the murder; Schneider explained that a person suffering from mental illness will, at times, do appropriate things, often depending on their state of mind and level of psychological arousal at the time. Schneider also described some of appellant's bizarre behavior immediately after the incident as atypical for someone who felt guilt about his action, suggesting that appellant was not aware that killing Dinh was wrong.

The State hired its own expert: Dr. James Avery Rush IV, M.D., a psychiatrist, who agreed with Schneider that appellant was suffering from a mental illness, but expressly disagreed that appellant was unable to distinguish right from wrong. Unlike

8

Schneider, Rush cited appellant's fabricated self-defense story and some of appellant's behavior prior to the murder as evidence that appellant knew that killing Dinh was wrong. Rush's conclusion, after reviewing the records, reports, and interviews and his examination of appellant approximately two and one-half years after the incident, was that appellant was sane at the time of the murder.

Rush testified that appellant reported to him that he killed Dinh because he thought Dinh was a cannibal and was going to kill children. Rush noted that nowhere, prior to his examination by Dr. Schneider, did appellant mention killing Dinh to prevent Dinh from cannibalizing anyone. Rush also explained that the fact that appellant called 911 after the killing demonstrated that he knew "something was wrong with what he had just done." In Rush's experience, had appellant been experiencing at the time of the murder the later-reported hallucinations that Dinh was a cannibal who was about to eat appellant, some manifestation of appellant's abnormal thinking and hallucinations of Dinh's possession and cannibalism would have been revealed the day of the murder or soon thereafter, indicating that an acutely psychotic person experiencing such thought patterns or hallucinations would not be able to suppress them for a sustained period in that situation. Rush also testified that appellant's apology to his wife for striking her days before the murder indicated that, at that time, he was able to distinguish right from wrong; appellant knew that punching his wife was wrong. Ultimately, Rush agreed with Schneider that appellant was suffering from an active mental disease the day of the murder but disagreed that, as a result of that mental disease, appellant was unable to distinguish right from wrong.

9

By its guilty verdict, the jury rejected appellant's plea of insanity and, consistent with Rush's conclusions, impliedly found that appellant was sane at the time of the offense. Appellant now complains on appeal from the trial court's judgment that (1) the trial court abused its discretion by admitting Rush's testimony when Rush did not qualify under the Texas Code of Criminal Procedure as an expert who could be appointed by the trial court to conduct sanity examinations, (2) the evidence was legally insufficient to support the jury's finding that appellant was sane at the time he killed Dinh, and (3) the evidence was factually insufficient to support that same finding. We will address these issues in turn.[3]

## Admission of Rush's Testimony

Appellant contends that, because Rush did not qualify for appointment by the trial court to conduct an examination of appellant's sanity, the trial court abused its discretion by admitting his testimony. From the record, it appears that Rush did not meet a number of the qualifications outlined in the Texas Code of Criminal Procedure for a court-appointed expert to conduct sanity examinations. The issue we must address is whether he had to meet those qualifications in this context.

## Standard of Review

We review the trial court's decision to exclude or admit evidence for an abuse of discretion. *See Montgomery v. State*, 810 S.W.2d 372, 379 (Tex. Crim. App. 1990) (en

---

[3] The procedural considerations and the relationship of the issues presented to this Court make it more logical to address the admission of Rush's testimony first although appellant's challenge to the legal sufficiency of the evidence would provide the greatest relief and, therefore, ordinarily would be addressed first. *See Chaney v. State*, 314 S.W.3d 561, 565 (Tex. App.—Amarillo 2010, pet. ref'd) (citing TEX. R. APP. P. 43.3 and *Bradley's Elec., Inc. v. Cigna Lloyds Ins. Co.*, 995 S.W.2d 675, 677 (Tex. 1999) (per curiam)).

banc) (citing *Marras v. State*, 741 S.W.2d 395, 404 (Tex. Crim. App. 1987) (en banc)). The test for abuse of discretion is whether the trial court acted without reference to any guiding rules and principles. *Id.* at 380. We will uphold the trial court's ruling "so long as the result is not reached in an arbitrary or capricious manner." *Id.* Further, we will sustain the trial court's decision if that decision is correct on any theory of law applicable to the case. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990) (en banc).

Applicable Law

The Texas Code of Criminal Procedure authorizes the trial court, on its own motion or a motion by either party, to appoint a psychiatrist or psychologist to examine the defendant with regard to the insanity defense and testify as to the defendant's sanity, provided the psychiatrist or psychologist meet the code's several specific qualifications:

(a) The court may appoint qualified psychiatrists or psychologists as experts under this chapter. To qualify for appointment under this subchapter as an expert, a psychiatrist or psychologist must:

(1) as appropriate, be a physician licensed in this state or be a psychologist licensed in this state who has a doctoral degree in psychology; and

(2) have the following certification or experience or training:

(A) as appropriate, certification by:

(i) the American Board of Psychiatry and Neurology with added or special qualifications in forensic psychiatry; or

(ii) the American Board of Professional Psychology in forensic psychology; or

(B) experience or training consisting of:

11

(i) at least 24 hours of specialized forensic training relating to incompetency or insanity evaluations;

(ii) at least five years of experience in performing criminal forensic evaluations for courts; and

(iii) eight or more hours of continuing education relating to forensic evaluations, completed in the 12 months preceding the appointment and documented with the court.

(b) In addition to meeting qualifications required by Subsection (a), to be appointed as an expert a psychiatrist or psychologist must have completed six hours of required continuing education in courses in forensic psychiatry or psychology, as appropriate, in the 24 months preceding the appointment.

(c) A court may appoint as an expert a psychiatrist or psychologist who does not meet the requirements of Subsections (a) and (b) only if exigent circumstances require the court to base the appointment on professional training or experience of the expert that directly provides the expert with a specialized expertise to examine the defendant that would not ordinarily be possessed by a psychiatrist or psychologist who meets the requirements of Subsections (a) and (b).

TEX. CODE CRIM. PROC. ANN. art. 46C.102 (West 2006). A psychiatrist or psychologist appointed by the trial court is not considered an expert witness for either party; rather, he or she is treated as "the court's disinterested witness." *See De Freece v. State*, 848 S.W.2d 150, 154 (Tex. Crim. App. 1993) (en banc); *see also Granviel v. State*, 552 S.W.2d 107, 115 (Tex. Crim. App. 1976) (characterizing court-appointed psychiatrist as "the court's disinterested expert"). The Texas Code of Criminal Procedure contemplates that a defendant may also wish to be examined by his own expert: "If a defendant wishes to be examined by an expert of the defendant's own choice, the court on timely request shall provide the examiner with reasonable opportunity to examine the defendant." TEX. CODE CRIM. PROC. ANN. art. 46C.107 (West 2006). Neither Article

12

46C.107 itself nor any other provision in the code appears to apply Article 46C.102's specific qualifications to an expert of the defendant's own choice.

Analysis

Appellant cites *Owens v. State*, 437 S.W.3d 584 (Tex. App.—Texarkana 2014) *pet. granted*, No. PD-0967-14, 2014 Tex. Crim. App. LEXIS 1391 (Tex. Crim. App. 2014),[4] as support for his position that, even though Rush was not a court-appointed expert, he must meet Article 46C.102's qualification requirements before his testimony is admissible as expert testimony. Appellant seizes on language from *Owens*, which he cites as support that any State-sponsored expert—regardless of whether that expert was appointed by the trial court—must meet the educational, training, and practical requirements of Article 46C.102: "A person who testifies as an expert regarding a defendant's competence to stand trial must be a licensed psychiatrist or psychologist and must satisfy a precise list of requirements." *See id.* at 586 (dealing with expert qualification under Articles 46B.021 and 46B.022, analogous provisions governing competency to stand trial but which, notably, make appointment mandatory upon "a determination that evidence exists to support a finding of incompetency"). For a number of reasons, we are not persuaded by appellant's reliance on *Owens* in support of his contention.

---

[4] The *Owens* court concluded that the court-appointed expert on the appellant's competency in that case did not qualify for appointment under Article 46B.022(a)(2)(B). *See Owens*, 437 S.W.3d at 589. The court reversed the trial court's judgment and remanded the cause for a new trial. *See id.* The Texas Court of Criminal Appeals granted the State's petition for discretionary review on only one of the State's grounds: "Whether the appellate court erred in reversing the conviction in lieu of abating the appeal and ordering a retrospective competency trial." That said, the Texarkana Court's conclusions relating to the qualification issue and its analysis on that issue will not be addressed by the Texas Court of Criminal Appeals.

13

First, we note that the procedural history of and legal issues raised in *Owens* are clearly distinguishable from those in the case at bar; in *Owens*, the expert on competence was, in fact, court-appointed and, by the State's own admission, did not meet the qualifications of Article 46B.022 for appointment. *See id.* at 585, 587; *see also* TEX. CODE CRIM. PROC. ANN. art. 46B.022 (West Supp. 2014). Additionally, as has been noted, *Owens* dealt with incompetency rather than insanity, and, while the two issues share some similar considerations, they remain two distinct legal concepts with distinctive definitions, procedures, and consequences. *See Arnold v. State*, 873 S.W.2d 27, 35 (Tex. Crim. App. 1993) (citing *Manning v. State*, 730 S.W.2d 744, 747 (Tex. Crim. App. 1987) (en banc)).

Secondly, even reading the cited, competency-related language in *Owens* as somewhat supportive of such a position in the insanity context, the plain language of Article 46C.102 itself suggests that it applies only to court-appointed experts: "To qualify for appointment under this subchapter as an expert . . . ." *See* TEX. CODE CRIM. PROC. ANN. art. 46C.102(a). "Under the canons of statutory construction, we are to construe a statute according to its plain language, unless the language is ambiguous or the interpretation would lead to absurd results that the legislature could not have intended." *Tapps v. State*, 294 S.W.3d 175, 177 (Tex. Crim. App. 2009) (quoting *Williams v. State*, 253 S.W.3d 673, 677 (Tex. Crim. App. 2008)). "In an attempt to discern the fair, objective meaning of the text at the time of its enactment, '[w]e assume that every word has been used for a purpose and that each word, phrase, clause, and sentence should be given effect if reasonably possible.'" *Id.* (quoting *Campbell v. State*, 49 S.W.3d 874, 876 (Tex. Crim. App. 2001) (en banc)). Ordinarily, it is not for the courts to add or

14

subtract from the plain language of a statute when that statute is clear and unambiguous. *See id.* (citing *Coit v. State*, 808 S.W.2d 473, 475 (Tex. Crim. App. 1991) (en banc)). While the result of the application of the plain language of Article 46C.102 may mean that a court-appointed expert may have to meet the specific qualifications of that provision while an expert for the State or for the defense may not have to meet such rigorous qualification requirements, we see such a result as arguably undesirable by the adverse party, but it does not seem—nor does either party contend on appeal that it is—an "absurd" result. In the absence of an absurd result, we will construe Article 46C.102 in accordance with its plain language, as applicable to court-appointed experts on the insanity issue. *See Tapps*, 294 S.W.3d at 177.

Finally, though there appears to be no authority directly on point, the authority that does exist is contrary to appellant's position. When dealing with Article 46C.102's predecessors, the Texas Court of Criminal Appeals confirmed the distinction between court-appointed experts and those experts independently hired by either party and rejected a contention that predecessor provisions, Articles 46.02 and 46.03, composed the exclusive method by which a defendant could be examined on the issue of insanity:

> We held [in *Patterson v. State*] that Art. 46.02(2)(f)(1), V.A.C.C.P. did not provide the exclusive procedure for examining the defendant, and consequently the State's rebuttal testimony was proper even though [its expert] was not court-appointed and had examined the defendant solely at the State's request. Similarly, in this case appellant was entitled to call his own expert witnesses to testify that he was insane at the time of the commission of the offense and the State was entitled to rebut that testimony with its own expert witnesses. These witnesses need not be court-appointed and are not subject to the above-mentioned specific provisions of [Articles 46.02 and 46.03] that court-appointed psychiatrists are subject to.

15

*Brandon v. State*, 599 S.W.2d 567, 576 (Tex. Crim. App. 1979) (discussing the court's previous rejection of such a contention in *Patterson v. State*, 509 S.W.2d 857, 862 (Tex. Crim. App. 1974)), *vacated on other grounds*, 453 U.S. 902, 101 S. Ct. 3134, 69 L. Ed. 2d 988 (1981).  Former Article 46.03 and the current provision in Article 46C.102 do vary a great deal in terms of the specific requirements imposed on an expert who is appointed by the trial court to conduct a sanity examination.  Nonetheless, *Brandon*'s and *Patterson*'s positions are instructive here, and, in this particular context and in light of the plain language of Article 46C.102, their application is intuitive: Article 46C.102 applies only to court-appointed experts.[5]

That said, Rush, hired as an expert by the State, need not qualify under Article 46C.102 in order for his testimony to be admitted as expert testimony on appellant's sanity at the time of the murder.  Instead, precisely as the trial court concluded, the admission of Rush's testimony was governed by the more general Rule 702.  See TEX. R. EVID. 702.  Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

Appellant does not contend that Rush does not qualify as an expert under Rule 702. And, based on Rush's knowledge, skill, experience, training, and education in the field of psychiatry, the trial court did not abuse its discretion by concluding that Rush qualified as an expert under Rule 702 and admitting his testimony as such.  We overrule

---

[5] Our holding to this effect is in no way intended to constrain or otherwise impact an indigent defendant's constitutional right of access to a psychiatric expert who may be appointed under the principles set forth in *Ake v. Oklahoma*, 470 U. S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985).

16

appellant's contention.  We now turn to appellant's challenge to the sufficiency of the evidence.

## Sufficiency of the Evidence

Appellant challenges the legal and factual sufficiency of the evidence to support the jury's rejection of his insanity defense, implied by its guilty verdict.

Applicable Law

The Texas Penal Code outlines generally the affirmative defense of insanity:

> (a) It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong.
>
> (b) The term "mental disease or defect" does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

TEX. PENAL CODE ANN. § 8.01 (West 2011).

Texas law excuses a defendant from criminal responsibility if he proves, by a preponderance of the evidence, the affirmative defense of insanity.  *Ruffin v. State,* 270 S.W.3d 586, 592 (Tex. Crim. App. 2008).  The insanity defense focuses on whether the accused understood the nature of his action and whether he knew he should not do it.  *See Bigby v. State*, 892 S.W.2d 864, 878 (Tex. Crim. App. 1994) (en banc).  The insanity defense excuses the person from criminal responsibility even though the State has proved every element of the offense, including the *mens rea*, beyond a reasonable doubt.  *Ruffin*, 270 S.W.3d at 592.  "The test for determining insanity is whether, at the time of the conduct charged, the defendant—as a result of a severe mental disease or defect—did not know that his conduct was 'wrong.'"  *Id.*  Under Texas law, "wrong" in

this context means "illegal." *Id.* (citing *Bigby*, 892 S.W.2d at 878). Thus, the question for deciding insanity becomes as follows: Does the defendant factually know that society considers this conduct against the law, even though the defendant, due to his mental disease or defect, may think that the conduct is morally justified? *Id.* If the accused knows that his conduct is "illegal" by societal standards, then he understands that his conduct is wrong, even if, due to a mental disease or defect, he thinks his conduct is morally justified. *See id.*

"There is a general presumption of sanity and the defendant bears the burden of proving, by a preponderance of the evidence, his insanity at the time of the conduct charged." *Martinez v. State*, 867 S.W.2d 30, 33 (Tex. Crim. App. 1993) (en banc) (citing *Riley v. State*, 830 S.W.2d 584, 585 (Tex. Crim. App. 1992) (en banc)). At trial, a defendant bears both the burden of production of evidence and the burden of persuasion for his affirmative defense of insanity. See *Bigby*, 892 S.W.2d at 875. Ultimately, whether the defense of insanity was proved is a decision that lies within the province of the trier of fact, not only as to the credibility of witnesses and the weight of the evidence, but also as to the limits of the defense. *See id.* at 878 (quoting *Graham v. State*, 566 S.W.2d 941, 952 (Tex. Crim. App. 1978) (en banc)).

Standards of review

Appellant challenges the legal and factual sufficiency of the evidence to support the jury's implied rejection of his affirmative defense of insanity. Judge Cochran of the Texas Court of Criminal Appeals has observed that the court has properly adopted the civil standards of legal and factual sufficiency for "those few instances in criminal cases

in which the burden of proof is a preponderance of the evidence," such as affirmative defenses. *See Brooks v. State*, 323 S.W.3d 893, 924 (Tex. Crim. App. 2010) (Cochran, J., concurring).

Legal Sufficiency

When an appellant asserts that there is no evidence to support an adverse finding on which he had the burden of proof, we construe the issue as an assertion that the contrary was established as a matter of law. *Matlock v. State*, 392 S.W.3d 662, 669 (Tex. Crim. App. 2013) (citing the civil standard of review for legal sufficiency in *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005), and quoting *One Ford Mustang, VIN 1FAFP40471F207859 v. State*, 231 S.W.3d 445, 449 (Tex. App.—Waco 2007, no pet.)). We first search the record for evidence favorable to the finding, disregarding all contrary evidence unless a reasonable factfinder could not. *Id.* If we find no evidence supporting the finding, we then determine whether the contrary was established as a matter of law. *Id.* If there was some evidence, then the reviewing court must reject appellant's legal sufficiency claim. *Id.* (citing *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989)).

Factual Sufficiency

In reviewing the factual sufficiency of the jury's rejection of an affirmative defense, "an appellate court views the entirety of the evidence in a neutral light, but it may not usurp the function of the jury by substituting its judgment in place of the jury's assessment of the weight and credibility of the witnesses' testimony." *Id.* at 671 (citing *Meraz v. State*, 785 S.W.2d 146, 154 (Tex. Crim. App. 1990) (en banc)). Therefore, an

appellate court may sustain a defendant's claim of factual insufficiency only if, after setting out the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, the court clearly states why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased. *Id.* (citing *Meraz*, 785 S.W.2d at 154 n.2).

Analysis

Both experts agreed that appellant was suffering from a severe mental disease or defect at the time of the murder. The evidence certainly supports such a conclusion as well. Neither party challenges that aspect of the evidence. Resolution of appellant's issues will turn on evaluation of the evidence regarding appellant's ability, at the time of the murder, to distinguish right from wrong. One expert concluded that appellant was not able to make such a distinction as a result of his mental disease or defect; the other expert concluded that he *was* able to do so.

Having searched the record for evidence favorable to the jury's rejection of appellant's claim of insanity, we note Dr. Rush's testimony that certain behaviors preceding the murder and immediately after the murder, appellant's 911 call, his fabricated self-defense story, and his steadfast adherence to that story in the time immediately after the murder all suggest that, at the time he murdered Dinh, appellant was able to distinguish right from wrong. *See id.* at 669. Having found some evidence to support the jury's implied finding that appellant was sane at the time of the murder, we must reject appellant's challenge to the legal sufficiency of the jury's finding. *See id.* We overrule appellant's contention.

20

We next review the factual sufficiency of the evidence to support the jury's finding by evaluating the entirety of the evidence in a neutral light. *See id.* at 671. We have previously outlined in detail both doctors' bases for their conflicting conclusions regarding appellant's sanity at the time of the murder and note that the jury had before it the testimony of both doctors. Again, the determination of whether the insanity defense was proved lies within the province of the trier of fact. *See Bigby*, 892 S.W.2d at 878. Remaining mindful that we are not to "usurp the function of the jury by substituting our judgment in place of the jury's assessment of the weight and credibility of the witnesses' testimony," we cannot state, based on the record before us, that the evidence contrary to the jury's finding so greatly outweighs the evidence supporting the verdict that the verdict is manifestly unjust, conscience-shocking, or clearly biased. *See Matlock*, 392 S.W.3d at 671; *Meraz*, 785 S.W.2d at 154. We overrule appellant's contention that the evidence supporting the jury's verdict was factually insufficient.

## Conclusion

Having overruled all three of appellant's issues, we affirm the trial court's judgment of conviction. *See* TEX. R. APP. P. 43.2(a).


Mackey K. Hancock
Justice


Publish.


21

Print this page

# Envelope 5684315

## Case Information

| | |
|---|---|
| Location | Court Of Criminal Appeals |
| Date Filed | 06/15/2015 04:45:22 PM |
| Case Number | |
| Case Description | |
| Assigned to Judge | |
| Attorney | John Bennett |
| Firm Name | John Bennett |
| Filed By | John Bennett |
| Filer Type | Not Applicable |

## Fees

| | |
|---|---|
| Convenience Fee | $0.00 |
| Total Court Case Fees | $0.00 |
| Total Court Filing Fees | $0.00 |
| Total Court Service Fees | $0.00 |
| Total Filing & Service Fees | $0.00 |
| Total Service Tax Fees | $0.00 |
| Total Provider Service Fees | $0.00 |
| Total Provider Tax Fees | $0.00 |
| Grand Total | $0.00 |

## Payment

| | |
|---|---|
| Account Name | John Bennett |
| Transaction Amount | $0.00 |
| Transaction Response | |
| Transaction ID | 9327485 |
| Order # | 005684315-0 |

## Petition for Discretionary Review

| | |
|---|---|
| Filing Type | EFile |
| Filing Code | Petition for Discretionary Review |
| Filing Description | |
| Reference Number | |
| Comments | Thanks! |
| Status | Rejected |

## Fees

| | |
|---|---|
| Court Fee | $0.00 |
| Service Fee | $0.00 |

## Rejection Information

| Rejection Reason | Time | Rejection Comment |
|---|---|---|
| Other | 06/19/2015 10:40:52 | The petition for discretionary review does not contain the identity of Judge, Parties and Counsel [Rule 68.4(a)]. You have ten days to tender a corrected petition for |

AM           discretionary review.

## Documents

| | | |
|---|---|---|
| *Lead Document* | Pham PDR final.pdf | [Original] |