

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-17-00228-CR
No. 07-17-00229-CR
No. 07-17-00230-CR
No. 07-17-00231-CR

_____

VICTOR ANDREW APODACA, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

On Appeal from the 100th District Court
Carson County, Texas
Trial Court No. 6021; Honorable Stuart Messer, Presiding

February 25, 2019

## MEMORANDUM OPINION

Before QUINN, C.J., and PIRTLE and PARKER, JJ.

Appellant, Victor Andrew Apodaca, was convicted by a jury of two counts of aggravated assault against a public servant,[1] one count of evading arrest in a motor

---

[1] *See* TEXAS PENAL CODE ANN. § 22.02(a)(2) (West 2011).  An offense under this section is a first degree felony.  *Id.* at § 22.02(b)(2)(B).

vehicle,[2] and one count of committing a terroristic threat.[3]  At the same time, the jury rejected Appellant's affirmative defense of insanity.  Prior to trial, the range of punishment for each offense was enhanced by two prior felony convictions;[4] however, at trial, the State presented only one prior felony conviction.[5]

Appellant entered a plea of "true" as to the enhancement allegation and the jury assessed his sentence at sixty years confinement and a fine of $500 for each count of aggravated assault; twenty years confinement and a fine of $500 for the one count of evading arrest in a motor vehicle; and twenty years confinement and a fine of $500 for the one count of terroristic threat.  The trial court entered separate judgments for the four offenses alleged in the indictment.[6]   In each of those judgments, the trial court ordered that the sentences would run concurrently.

---

[2] *See* TEXAS PENAL CODE ANN. § 38.04(a) (West 2016).  An offense under this section is a third degree felony.  *Id.* at § 38.04(b)(2)(A).

[3] *See* TEXAS PENAL CODE ANN. § 22.07(a)(5) (West Supp. 2018).  An offense under this section is a third degree felony.  *Id.* at § 22.07(e).

[4] *See* TEXAS PENAL CODE ANN. § 12.42(d) (West Supp. 2018).  An offense enhanced under this section is punishable by imprisonment in the Texas Department of Criminal Justice for life, or for any term of not more than 99 years or less than 25 years.  Section 12.42(a) makes no provision for the assessment of a fine.

[5] *See* TEXAS PENAL CODE ANN. § 12.42(a), (c)(1) (West Supp. 2018).  A third-degree felony offense enhanced under subsection (a) is punishable as a second degree felony (imprisonment for any term of not more than 20 years or less than 2 years and a fine not to exceed $10,000).  A first degree felony offense enhanced under subsection (c)(1) is punishable by imprisonment in the Texas Department of Criminal Justice  for life, or for any term of not more than 99 years or less than 15 years and a fine not to exceed $10,000.

[6] During a pretrial hearing on June 26, 2017, the State waived the count alleging the offense of escape.  *See* TEX. PENAL CODE ANN. § 38.06 (West 2016).

On appeal, Appellant raises two issues: (1) whether Appellant's Fourth Amendment rights under the United States Constitution[7] were violated when he was detained under the pretext of a consensual encounter, rendering the events that followed inadmissible and (2) whether the evidence at trial was legally and factually sufficient to support the jury's rejection of his insanity defense. We modify the judgments pertaining to the offenses of evading arrest and terroristic threat to correct a clerical error and affirm the trial court's judgments as modified.

BACKGROUND

Appellant was charged by indictment with two counts of aggravated assault against a public servant, one count of evading arrest in a motor vehicle, one count of escape (subsequently dismissed), and one count of committing a terroristic threat, arising out of facts and circumstances that occurred at a Love's truck stop in Carson County, Texas, on September 13, 2015. The indictment alleged that Appellant committed the offenses of aggravated assault by physically dragging with his vehicle DPS Troopers Anthony Mata and Brian Ihnen while they were in the process of discharging their official duties by attempting to arrest or detain Appellant. The indictment further alleged that during the commission of those offenses, Appellant exhibited a deadly weapon, to-wit: a motor vehicle. The indictment also alleged that Appellant intentionally fled from DPS Sergeant Daniel Rangel while knowing he was a peace officer that was attempting to lawfully arrest or detain him. Finally, the indictment alleged that Appellant threatened to commit an

---

[7] U.S. CONST. amend. IV.

offense involving multiple people, namely, to use a bomb with intent to place the public or a substantial group of the public in fear of serious bodily injury.

In April 2016, Appellant filed a motion to suppress asserting he was illegally detained from the outset of his encounter with Sergeant Rangel. By that motion, Appellant sought to suppress all evidence of what transpired after the encounter. In June 2017, Appellant filed his notice of intent to raise an insanity defense and the State filed its notice of intent to seek enhanced punishment based upon a prior felony conviction for breaking and entering and a second prior felony conviction for battery upon a peace officer. In June 2017, a three-day jury trial was held.

The State's evidence at trial established that, on September 13, 2015, Sergeant Rangel was participating in the search of a vehicle alongside Interstate 40 when he observed a driver operating a Cadillac in a very robotic fashion. When the traffic stop was completed, Sergeant Rangel and his partner caught up with the Cadillac on Interstate 40 and noticed that it suddenly slowed below the speed limit. Although Sergeant Rangel did not observe any traffic violations, he did decide to follow the vehicle into a Love's truck stop hoping to abate his suspicions by speaking with the driver.

Without turning on his overhead lights or hindering the Cadillac's ability to leave the gas pumps in any way, Sergeant Rangel pulled into the truck stop. He was wearing his trooper uniform and badge. He walked over to the Cadillac and knocked on the driver-side window. Appellant rolled down the window and Sergeant Rangel asked him if he was willing to speak with him. Appellant agreed. Sergeant Rangel then asked Appellant if he was willing to speak to him outside the vehicle and Appellant complied.

4

When Appellant emerged from the Cadillac, the belt to his pants was broken. When Sergeant Rangel noted that his belt was broken, Appellant explained that he broke it while seated in the Cadillac. Sergeant Rangel observed that Appellant was experiencing a high level of anxiety as evidenced by extreme nervousness and an inability to stand still or be quiet. When Sergeant Rangel asked his name, he gave his name as Andrew Rodriguez. He could not produce any identification and said he was traveling from Amarillo to Arkansas. Before questioning the passenger, Sergeant Rangel gave Appellant a pad and pencil and asked him to write his name and identifying information. This time he wrote down a different name—Victor Apodaca.

On further inquiry, Sergeant Rangel found out the Cadillac was plated out of New Mexico and was registered to two females. He also discovered that the passenger did not have any identification on him and did not know the destination. At this point, he returned to his patrol vehicle and requested assistance. He then ran Appellant's identifying information through his computer and received nothing. About this time, Sergeant Ihnen, assigned to the K-9 unit, arrived to assist him.

Sergeant Rangel returned to Appellant and asked if he could search his person. Appellant assented. He then asked if he could search the vehicle and Appellant refused. Sergeant Rangel then conducted an "open air" canine sniff around the outside of the Cadillac and the dog alerted. When he advised Appellant of the results of the "open air" sniff, Appellant admitted there was contraband in the vehicle. Upon searching its interior, Sergeant Rangel discovered some drug paraphernalia and a bag containing a small amount of marijuana. About the time he completed his search, Sergeant Rangel heard

5

Sergeant Ihnen calling him. When he looked up, Sergeant Ihnen was struggling with Appellant.

While Sergeant Rangel was searching the Cadillac, Appellant apparently became very agitated and started yelling that the troopers could not search his vehicle. About this same time, Appellant started making gestures and hand signals to the passenger, who had exited the vehicle and was lying face down on the ground. Sergeant Ihnen attempted to put handcuffs on Appellant, but he resisted and began pulling away. At this point, Sergeant Ihnen realized things were getting out of hand and he yelled for Sergeant Rangel. Even with the help of Sergeant Rangel, however, Appellant managed to get away from the two troopers and started yelling that he "had a bomb in his ass and he was going to blow up everyone at the station." Appellant told his passenger to corroborate his threat. While these threats were being made, there were bystanders in the Love's parking lot watching the events unfold.

About this time, Trooper Mata arrived and observed that the two troopers had their tasers drawn and pointed at Appellant, who was standing next to his vehicle. Trooper Mata could hear Appellant yelling that "he had a bomb up his ass and he was going to blow everybody up."

During the commotion, Appellant was able to jump into the driver's seat of his vehicle and he began revving the engine. Sergeant Ihnen managed to get Appellant in a headlock and Trooper Mata, who had been trying to outflank Appellant, was partially in the vehicle on the passenger side, attempting to grab the keys. Once Appellant was able to get the vehicle in "Reverse," he suddenly backed up toward the front entrance to the

6

truck stop before veering toward the diesel pumps.  During this maneuver, both troopers were hanging onto the vehicle and being dragged through the parking lot.

Trooper Mata managed to disengage himself from the Cadillac before it came to a stop just short of the diesel pumps.  Sergeant Ihnen somehow managed to get the Cadillac in "Park" and was struggling with Appellant while yelling for him to stop.  Both troopers were also attempting to use their electroshock guns to subdue him.   Sergeant Ihnen managed to shoot one electroshock prong into Appellant, at which point he threatened that Sergeant Ihnen was "going to die."

When the vehicle sped away in reverse, Sergeant Ihnen was the only one in the Cadillac with Appellant.  He was shooting Appellant with his electroshock gun to no avail and his right foot was being dragged by the vehicle.  When the electroshock gun proved ineffective, Sergeant Ihnen began hitting Appellant to persuade him to stop.  Appellant managed to get the Cadillac in "Drive" and exited the parking lot heading down an Interstate 40 ramp traveling the wrong direction.  He kept threatening Sergeant Ihnen that he "was going to die."  Sergeant Ihnen managed to push himself from the vehicle onto the parking lot exit ramp, causing him to land on his back and hit his head on the pavement.[8]

Appellant later abandoned the Cadillac in an open field and escaped to Amarillo. Acting on a tip, Texas Rangers located Appellant at a residence and called an Amarillo SWAT team to assist.  When the SWAT team confronted Appellant by loudspeaker, he

---

[8] He was taken to a nearby hospital where he was treated for concussion or brain swelling and was out of work in excess of a month.

responded that he had hostages in the house. After a substantial period of negotiation, the SWAT team deployed two rounds of chemical agents into the residence. Shortly thereafter, the screen door opened and Appellant appeared behind a woman. The SWAT team's repeated commands to surrender were ignored and Appellant continued to use the woman as a shield. He had a pistol tucked in his waistband and an arm around the woman's neck. A SWAT officer slowly advanced toward Appellant and managed to strike him with the muzzle of his gun. With the assistance of other officers, Appellant was handcuffed and taken to jail.

In his opening statement, Appellant's attorney represented that the defense did not dispute any of the facts asserted by the prosecution but instead contended Appellant was insane at the time of the commission of the crimes. In support of his insanity defense, Appellant's counsel offered the testimony of Dr. Steven Schneider, a licensed psychologist and clinical neuropsychologist.[9] At trial, Dr. Schneider testified that he had conducted an evaluation of Appellant including a competency and sanity evaluation. Prior to drafting his report, he reviewed Appellant's hospital records, school records, CPS case materials, and historical documents relating to Appellant's mental health issues.

As a result of his evaluation, Dr. Schneider concluded that Appellant had some psychotic issues that began in his late adolescence or early adulthood. In his opinion, Appellant had a history of mental problems and abnormal perceptual disturbances that

---

[9] In April 2017, the trial court granted Appellant's motion for a psychiatric examination to determine whether he was sane at the time the alleged offenses occurred. Pursuant to the trial court's order, Dr. Schneider conducted an evaluation. In his report dated June 11, 2017, Dr. Schneider concluded that Appellant did not know at the time of the commission of the alleged offenses, whether his conduct was right or wrong and was incapable of conforming his conduct to the requirements of the law. He also concluded that Appellant was an individual with mental illness without psychosis and was not a person with mental retardation.

would lead him to believe it was possible that he was not able to function properly at the time the offenses were committed. He further diagnosed Appellant as having an unspecified psychotic disorder, major depressive disorder, generalized anxiety disorder, and a severe unspecified neuro-cognitive disorder.

On cross-examination, Dr. Schneider testified that, at the time of the offense, Appellant had a severe mental disease or defect. However, after reviewing the video and audio recorded at the time of the offense, he changed his conclusions and opined that Appellant knew what he was doing and he knew that his conduct was wrong. Dr. Schneider further opined that at the time Appellant committed the offenses on September 13, 2015, he was sane. He testified that his amended opinion was due to the State's production of and his review of the video and audio recordings of the commission of the offenses. He testified that his first opinion was premature because he had only been supplied the information the defense had provided, i.e., old medical and school records. He testified he did not know that the video and audio recordings of the offenses existed until after the initial evaluation, and once he viewed them, he changed his opinion based on the new information.

ISSUE ONE—NONCONSENSUAL ENCOUNTER

Appellant asserts his Fourth Amendment rights[10] were violated because he was detained by Sergeant Rangel under the pretext of a consensual encounter rendering the

---

[10] The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV.

events that followed at the truck stop inadmissible.  Because Appellant failed to preserve his complaint in the trial court, we do not reach this issue on appeal.

For a party to preserve a complaint for appellate review, the complaining party must make a specific objection and obtain a ruling on the objection.  *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002).  In addition, a party must make the complaint at the earliest possible opportunity, and the point of error on appeal must comport with the objection made at trial.  *Id.*  Failure to object at trial may waive even constitutional errors.  *Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008). *See Darland v. State*, 582 S.W.2d 452, 455 (Tex. Crim. App. 1979) (errors concerning improper introduction of evidence under the Fourth Amendment were waivable).

Here, Appellant filed a motion to suppress based upon an alleged illegal detention and nonconsensual encounter between Sergeant Rangel and himself.  However, the record does not reflect that he obtained a ruling on that motion.  Neither did he object at trial to the admission of the evidence he sought to suppress by that motion.  Furthermore, Appellant never sought a jury instruction based on any alleged Fourth Amendment violation, nor did he seek a finding that Sergeant Rangel's initial encounter with him was nonconsensual.  Accordingly, we find that the trial court rendered no "decision" or "ruling" on Appellant's motion and that Appellant, therefore, failed to preserve the issue for consideration on appeal.  *See Yazdchi v. State*, 428 S.W.3d 831, 844-45 (Tex. Crim. App. 2014).  *See also* TEX. R. APP. P. 33.1.  Appellant's first issue is overruled.

ISSUE TWO—INSANITY DEFENSE

Appellant's second issue asserts that the evidence at trial was legally and factually insufficient to support the jury's implied rejection of his insanity defense. We disagree.

APPLICABLE LAW—INSANITY

There is a general presumption of sanity and an accused bears the burden of proving, by a preponderance of the evidence, his insanity at the time of the offense charged. *Martinez v. State,* 867 S.W.2d 30, 33 (Tex. Crim. App. 1993) (en banc). At trial, the accused bears not only the burden of production of evidence, but also the burden of persuasion. *See Bigby v. State*, 892 S.W.2d 864, 878 (Tex. Crim. App. 1994), *cert. denied*, 515 U.S. 1162, 115 S. Ct. 2617, 132 L. Ed. 2d 860 (1995). Ultimately, whether an accused has established the affirmative defense of insanity is a decision that lies within the province of the trier of fact—not only as to the credibility of the witnesses, but also as to the weight to be given that evidence. *Id.*

The Texas Penal Code outlines the affirmative defense of insanity as follows:

(a) It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong.

(b) The term "mental disease or defect" does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

TEX. PENAL CODE ANN. § 8.01 (West 2011).

Pursuant to this provision, Texas law excuses a defendant from criminal responsibility if he proves, by a preponderance of the evidence, the essential elements of this affirmative defense. *Pham v. State*, 463 S.W.3d 660, 671 (Tex. App.—Amarillo 2015, pet. ref'd); *Reyna v. State*, 116 S.W.3d 362, 366 (Tex. App.—El Paso 2003, no pet.) (citing

11

*Meraz v. State*, 785 S.W.2d 146, 150 (Tex. Crim. App. 1990)). The essential question to be answered is whether, at the time of the conduct charged, the accused, as a result of severe mental disease or defect, understood the nature of his conduct and whether his conduct was wrong. TEX. PEN. CODE ANN. § 8.01(a) (West 2011); *Reyna*, 116 S.W.3d at 367. The essence of an insanity defense is to excuse the accused of criminal responsibility, even though the State has established the elements of the offense, including the *mens rea*, beyond a reasonable doubt. *Pham,* 463 S.W.3d at 671.

The insanity issue is not strictly medical but also involves legal and ethical considerations. *Bigby*, 892 S.W.2d at 877; *Reyna*, 116 S.W.3d at 367. Expert testimony may aid the jury in its determination of the ultimate issue but does not dictate the result. *See Graham v. State*, 556 S.W.2d 941, 949 (Tex. Crim. App. 1978); *Reyna*, 116 S.W.3d at 367. Only the jury can join non-medical components that must be considered in deciding the ultimate issue. *Bigby*, 892 S.W.2d at 878; *Reyna*, 116 S.W.3d at 367. Because the circumstances of the crime are always important in determining the accused's mental state at the time of the offense, the jury may consider such evidence as his demeanor before and after the offense, attempts to evade the police, attempts to conceal incriminating evidence, expressions of regret or fear of the consequences of his action, as well as other possible motives for the offense and other explanations of his behavior. *See Graham*, 566 S.W.2d at 951-52; *Torres v. State*, 976 S.W.2d 345, 347-48 (Tex. App.—Corpus Christi 1998, no pet.).

STANDARD OF REVIEW

Here, Appellant challenges the legal and factual sufficiency of the evidence to support the jury's implied rejection of his affirmative defense of insanity. Judge Cochran

12

of the Texas Court of Criminal Appeals has aptly observed that the Court has properly adopted the civil standards of legal and factual sufficiency for "those few instances in criminal cases in which the burden of proof is a preponderance of the evidence," such as affirmative defenses. *Pham*, 463 S.W.3d at 671 (citing *Brooks v. State*, 323 S.W.3d 893, 924 (Tex. Crim. App. 2010) (Cochran, J., concurring)). In that regard, the appropriate challenge to a jury finding concerning an issue upon which the complaining party had the burden of proof is either that the contrary finding was established as a matter of law (legal sufficiency), or that the existing finding was against the great weight and preponderance of the evidence (factual sufficiency). *Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.*, 766 S.W.2d 264, 275-76 (Tex. App.—Amarillo 1988, writ denied).

LEGAL SUFFICIENCY

When an appellant contends that the evidence was legally insufficient to support an adverse finding on an issue upon which he had the burden of proof, he is asserting that the contrary finding was established as a matter of law. In that situation, we construe the issue as an assertion that the contrary was established as a matter of law. *Pham*, 463 S.W.3d at 672 (citing *Matlock v. State*, 392 S.W.3d 662, 669 (Tex. Crim. App. 2013)). In other words, because Appellant is contending the evidence is legally insufficient to support the jury's rejection of his insanity defense (a matter upon which he had the burden of proof), we construe his argument to be that his insanity defense was established as a matter of law.

We first search the record for evidence favorable to the finding, disregarding all contrary evidence unless a reasonable fact finder could not. *Id.* If we find no evidence supporting the finding, we then determine whether the contrary was established as a

13

matter of law.  *Id.*  If there was some evidence supporting the finding, then the reviewing court must reject appellant's legal sufficiency claim.  *Id.*

FACTUAL SUFFICIENCY

In reviewing the factual sufficiency of the jury's rejection of an affirmative defense, "an appellate court views the entirety of the evidence in a neutral light, but it may not usurp the function of the jury by substituting its judgment in place of the jury's assessment of the weight and credibility of the witnesses' testimony."  *Pham*, 463 S.W.3d at 672 (citations omitted).  Ultimately, acceptance or rejection of the affirmative defense of insanity is a matter that lies within the province of the fact finder.  *See Bigby*, 892 S.W.2d at 878.

Therefore, an appellate court may sustain a claim of factual insufficiency to the rejection of an affirmative finding of insanity only if, after setting out the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, the court clearly states why the rejection of the defense is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased.  *Id.*

ANALYSIS

Here, we find there is sufficient evidence legally and factually to support the jury's rejection of Appellant's affirmative defense of insanity.  Although Dr. Schneider first opined that Appellant was insane at the time the crimes were committed, once he was provided with the video and audio recordings of the commission of the crimes, he changed his opinion and testified that, at the time of the commission of the crimes, Appellant was

aware his conduct was wrong and he was sane. Furthermore, the evidence of his actions prior to, during, and after the crimes were committed, supports the jury's decision. At the truck stop, Appellant was observed communicating with his passenger to garner support for his bomb threat. When his threat was unsuccessful, he jumped into the vehicle, revved the engine, and attempted to evade the troopers by driving away in reverse. He also threatened the trooper who was hanging onto the Cadillac that he was going to die if he continued to interfere with his attempt to escape. After that, he was able to successfully evade the authorities and escape. Subsequently, he negotiated with a SWAT team surrounding the house where he was hiding and attempted to escape custody a second time by using a human shield. On the other hand, we have Dr. Schneider's first opinion based upon old school records and examinations that Appellant furnished in support of his claim of insanity.

Based on this conflicting testimony, the jury was free to accept or reject either opinion offered by Dr. Schneider and assign to it whatever weight it determined that particular opinion merited. Judging from the verdict, the jury assigned greater weight to Dr. Schneider's second opinion that Appellant was sane at the time the crimes were committed. Furthermore, as outlined above, the jury was free to infer from the circumstances of the crimes that Appellant was sane. That is, his behavior showed forethought and planning as well as other motives or causes for his actions besides insanity. Because we find there is factually sufficient evidence in support of the jury's rejection of the affirmative defense of insanity, we necessarily find there is also legally sufficient evidence. Accordingly, Appellant's second issue is overruled.

15

REFORMATION OF THE JUDGMENTS AND CLERK'S ORDER TO WITHDRAW FUNDS

In our review of the record, it has come to our attention that two of the four judgments include a clerical error. Count Three (evading arrest) and Count Four (terroristic threat) indicate the "degree of offense" as a "2ND DEGREE FELONY," when in fact, the judgments should reflect that both offenses are third degree felonies.[11]

This court has the power to modify the judgment of the court below to make the record speak the truth when we have the necessary information to do so. TEX. R. APP. P. 43.2(b). *Ramirez v. State*, 336 S.W.3d 846, 852 (Tex. App.—Amarillo 2011, pet. ref'd) (citing *Bigley v. State*, 865 S.W.2d 26, 27-28 (Tex. Crim. App. 1993)). Appellate courts have the power to reform whatever the trial court could have corrected by a judgment *nunc pro tunc* where the evidence necessary to correct the judgment appears in the record. *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd). The power to reform a judgment is "not dependent upon the request of any party, nor does it turn on the question of whether a party has or has not objected in the trial court." *Id.* at 529-30. Accordingly, the trial court is instructed to enter judgments *nunc pro tunc* to reflect the correct degree of offenses and the clerk of the court is instructed to deliver a copy of the corrected judgments to this court and to the Institutional Division of the Texas Department of Criminal Justice.

Our review of the record further indicates that the trial court clerk has heretofore issued an *Order to Withdraw Funds* in the sum of $2,723.00 and a *Corrected Order to*

---

[11] As enhanced, these third-degree felony offenses were punishable as felonies of the second degree. *See* § 12.42(a) (West Supp. 2018). An offense "punished as" a higher offense raises the level of punishment, not the *degree of the offense*. *Oliva v. State,* 548 S.W.3d 518, 526-27 (Tex. Crim. App. 2018).

16

*Withdraw Funds* in the sum of $3,223.00. Because the clerk's record provided in this case does not include a *Bill of Costs*, we are unable to determine with exactitude the nature of the costs being collected. To the extent that the clerk is attempting to collect the $500 fine ordered in each of the four offenses (4 x $500 = $2,000.00 + $723 (court costs) = $2,723.00 (the exact amount of the original order to withdraw)), the clerk would be improperly attempting to collect the sum of $1,500.00, since concurrent fines are discharged *concurrently. See State v. Cook,* 248 S.W.3d 172, 177 (Tex. Crim. App. 2008) (holding that when sentences are ordered to run concurrently, fines are not cumulated). Because this mistake is apparent on the face of the record, we further order the clerk of the trial court to issue a corrected *Bill of Costs* and *Order to Withdraw Funds* and then to deliver a copy of the same to this court and to the Texas Department of Criminal Justice.

CONCLUSION

As reformed, the trial court's judgments are affirmed.

Patrick A. Pirtle
Justice

Do not publish.

17