In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*

_____

NO. 09-21-00273-CR
_____

YOVAHNIS FABAIN ROQUE, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 128th District Court
Orange County, Texas
Trial Cause No. A190150-R

## MEMORANDUM OPINION

Appellant Yovahnis Roque was convicted of capital murder and sentenced to life imprisonment in the Institutional Division of the Texas Department of Criminal Justice. Tex. Penal Code Ann. §§ 12.31(a)(2), 19.03(a)(8). In two appellate issues, he challenges the admissibility of evidence suggesting that he was voluntarily intoxicated at the time of the offense, evidence that Roque suggests would preclude a jury finding him insane. Tex. Penal Code Ann. §§ 8.01(a), 8.04(a); *See Davis v.*

1

*State*, 313 S.W.3d 317, 329-30 (Tex. Crim. App. 2010) (discussing voluntary intoxication). Finding no reversible error, we affirm the judgment of the trial court.

## I. Background

Appellant killed his two-year-old daughter Sophia by beating her with a hammer.[1] Appellant did not dispute that he did so, but pleaded "not guilty by reason of insanity[,]" meaning that at the time of the offense, he suffered from a "severe mental disease or defect[]" that prevented him from "know[ing] that his conduct was wrong." Tex. Penal Code Ann. § 8.01(a).

Because "[v]oluntary intoxication does not constitute a defense to the commission of a crime[,]" the State offered the challenged evidence of intoxication. *See* Tex. Penal Code Ann. § 8.04(a); *Sakil v. State,* 287 S.W.3d 23, 26-28 (Tex. Crim. App. 2009). The trial court admitted the evidence over Appellant's objection. Appellant argues that the voluntary intoxication evidence was inadmissible, prejudiced the jury, and without the admission of this evidence the jury would have found him not guilty by reason of insanity. We disagree. We summarize the relevant testimony below.

---

[1] We use pseudonyms to refer to the victim and her grandmother to conceal their identities. *See* Tex. Const. art. I, § 30 (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process[.]" *See Smith v. State*, No. 09-17-00081-CR, 2018 WL 1321410, at *1, n. 1 (Tex. App.—Beaumont Mar. 14, 2018, no pet.) (mem. op., not designated for publication).

## 1. The First Responders' Testimony

The jury heard testimony from four of the law enforcement officers who responded to the scene of Sophia's death. Chase Alexander was a patrol sergeant with the Orange County Sheriff's Office; Logan Holland was a sergeant with the Orange Police Department; Isaac Henry also was employed by the City of Orange Police Department; and Jesse Romero was the Assistant Chief of Police with the City of West Orange. Each of these witnesses testified that he was a certified peace officer in the State of Texas and outlined his respective duties and experience in law enforcement.

On the date of Sophia's death, Alexander was one of the first officers at the scene. When he arrived, he saw Appellant at the doorway of the house, naked and covered with blood and brain matter. He therefore ordered Appellant at gunpoint to lie on the ground and crawl toward him; Appellant complied, and Holland placed Appellant in handcuffs. Once Appellant was detained, Alexander and Romero performed a protective sweep of the house to check for other potential threats. They found no threats but observed that one of the bedrooms was in disarray and was covered with blood. Holland later discovered Sophia's body in the closet of that bedroom.

While Appellant was restrained in front of the house, Henry read Appellant his rights.[2] Although Appellant did not then articulate an understanding of his rights, he did state that he had killed his daughter. Henry also assisted with the search of the house, which yielded Appellant's cell phone, possible marijuana, and pills later determined to be methamphetamine.

## 2. The Interviewers' Testimony

Detective John Dee Taylor and Major Sparky Robinson, employees of the Orange Police Department, interviewed Appellant at the police station. They testified to Appellant's statements and actions during the interview, noting that Appellant seemed aware of the situation, and made both coherent and nonsensical statements. Specifically, their testimony shows that Appellant stated he had discovered a foreign substance in Sophia's brain, denied killing her, yet admitted hitting her in the head with a hammer. The detectives stated that in his interview the Appellant indicated he had no recollection of Sophia's death, told them that he was "going mad[,]" and admitted that he sometimes blacked out while using drugs. The Appellant also told the detectives he was sober when he was interviewed. Taylor testified that Roque was not tested for drug use before he was interviewed because Taylor believed probable cause did not exist to justify that type of test.

---

[2] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

When the detectives asked Roque whether it would have been wrong to kill Sophia, he acknowledged it would be wrong.

### 3. Dr. John Ralston's Testimony

Ralston is the forensic pathologist who performed Sophia's autopsy. He described his educational and professional qualifications and outlined the purpose and general procedure for conducting an autopsy. With specific reference to Sophia's autopsy, he noted that she was nude and that her body was covered in blood and brain matter. Sophia had suffered multiple severe injuries, including "a massive gaping skull fracture[]" and other injuries consistent with the claws from a claw hammer. Ralston further noted that "[a] great deal of brain tissue was missing from her skull[,]" and that her brain weighed "less than half what you'd expect for a child that age." In Ralston's opinion, Sophia died as the result of multiple blunt force injuries consistent with the use of a hammer.

### 4. Marie Abshire's Testimony

Abshire is Appellant's mother. She outlined Appellant's history of mental health issues, beginning with his becoming "paranoid" after being assaulted in school when he was about twelve years old. Thereafter, Appellant had ongoing problems, including depression. When Sophia was three weeks old, Appellant and Sophia's mother were struck by an intoxicated driver. Sophia's mother was killed in

the collision, and Appellant sustained a severe head injury. Following that accident, Appellant and Sophia resided with Abshire.

During the two days preceding Sophia's death, Appellant did not sleep and ate very little. He was "acting upset" and behaving oddly, and he apparently was hallucinating. Abshire therefore obtained an order to have Appellant committed, but when she returned home after doing so, she saw what had happened to her granddaughter.

## 5. Dr. Edward Gripon's Testimony

Gripon, a psychiatrist, outlined his education, training, and experience in the medical field. The trial court appointed Gripon to evaluate Appellant's competency to stand trial, as well as Appellant's sanity the day Sophia's murder occurred. After determining that Appellant was competent to stand trial, Gripon reviewed Appellant's "extensive" mental health records to assess Appellant's sanity on the day Sophia died. Dr. Gripon noted that Appellant not only had a personal mental health history that went "back quite some time[,]" but that Appellant had a family history of mental health issues. Gripon testified that Appellant had a genetic predisposition to suffer from certain mental health conditions. Gripon specifically mentioned that Appellant sustained a severe head injury and was diagnosed with post-traumatic stress disorder following an accident that resulted in the death of Sophia's mother. He also noted that Appellant has had "a history of mental health

6

difficulties since he was a teenager[]" and that Appellant has a history of depression, anxiety, panic attacks, hallucinations, a mood disorder, and multiple suicide attempts. He further stated that Appellant exhibited "occasional psychotic symptoms[,]" such as hallucinations. Gripon testified that, to cope with these problems, Appellant reported using and abusing several prescription and illegal drugs, including Xanax and marijuana, drugs that Dr. Gripon indicated tend to calm the user.

Gripon testified that, during the time frame immediately preceding Sophia's death, Appellant became increasingly delusional. Appellant reported to Gripon that Appellant believed that "the world was coming to an end[,]" and he was digging a hole in his yard to save his family. Appellant told Gripon that on the morning of Sophia's death, Appellant believed that Sophia had a microchip implanted in her and "[t]hought all of these terrible things were happening." In Gripon's opinion, Appellant's ability to recall his thoughts from that time was consistent with psychosis, not intoxication. The recordings of Appellant's irrational statements at the time of his initial interviews reinforced this opinion. When Dr. Gripon evaluated Appellant, Appellant was taking five different medications, including anti-psychotic medications, to address his mental health according to Dr. Gripon. Dr. Gripon believed these medications had improved Appellant's mental status.

Gripon testified that, at the time of Sophia's death, Appellant was suffering from a severe mental disease or disorder and that Appellant's psychotic episode would have rendered him unable to distinguish between right and wrong. He based this opinion on the lack of a rational reason for Appellant's actions. When asked about the relationship between an episode and an intoxicant, Gripon stated that a drug would not cause a psychotic episode unless the individual had an "underlying propensity for the mental illness itself." In contrast, however, he noted that "[w]here you commonly may see psychosis is in methamphetamine abuse" and in the use of synthetic marijuana. Gripon stated that it is not possible to separate the effects of a drug from the effects of an underlying mental illness. Even though it is impossible to separate the two, Gripon noted that illegal drug use will exacerbate psychosis, as will sleep deprivation. Moreover, use of methamphetamine, a stimulant, will cause sleep deprivation. Appellant acknowledged to Gripon his use of methamphetamine but contended that he had not used it recently.

## 6. Detective Theodore Hilyar's Testimony

Hilyar, a detective sergeant with the Orange Police Department, testified to the content of the cell phone found in Appellant's bedroom. Hilyar generally works as a narcotics investigator. Hilyar coordinated the content of Appellant's phone with corresponding content in a phone seized from another individual in an unrelated investigation. Appellant objected to this evidence on three grounds: (1) that it was

8

hearsay, (2) that it constituted inadmissible prior bad acts, and (3) that Hilyar lacked the ability to interpret the text messages. The trial court overruled these objections and permitted Hilyar to testify that several days before Sophia's death, Appellant was buying prescription and illegal drugs from a known drug dealer named Caldwell. Hilyar testified that, because Appellant did not provide a blood sample at the time of his arrest, it could not be determined whether he was intoxicated on the day the murder occurred.

## 7. Dallas Moreau's Testimony

The State called Moreau, a licensed professional counselor, as a rebuttal witness. He described his education, training, and experience, and explained his professional practice, which includes performing suicide evaluations on inmates at the Orange County jail. Moreau's experience also includes work in substance abuse treatment.

Moreau evaluated Appellant's suicide potential on the day after Sophia's death. Moreau described Appellant as "very upset, very distraught," in the initial visit, but he said Roque responded accurately when asked his name, age, and about his surroundings. Appellant also told Moreau that he had killed Sophia and was "very remorseful[]" over Sophia's death. Although Moreau was not permitted to express an opinion about Appellant's sanity, Moreau testified that he had no doubt that when he evaluated Roque, Roque understood that killing Sophia was wrong.

9

Moreau said he couldn't recall whether Appellant's mental health history included violent outbursts or major psychotic breaks. The absence of a history of violence, Moreau explained, led him to suspect substance abuse. Moreau testified that he asked Appellant about his drug use. According to Moreau, Roque told him that he had smoked marijuana and that his mother had given him a pill that "kept him awake for four days." Moreau noted that abuse of amphetamines or other stimulants can cause prolonged wakefulness, and that an extended lack of sleep may cause a break with reality. Moreau testified that "[m]ost drugs clear the system in about three to maybe five days[,]" So, Moreau said that he directed the jail staff to observe Appellant during that period to see if Appellant's mental status improved. Moreau reported that Appellant's situation improved after he was jailed, and Rogue regained some lucidity. Moreau acknowledged, however, that he had no concrete evidence, such as a drug test, to demonstrate that Rogue was under the influence of drugs when he was arrested or when the murder occurred.

## II. Standard of Review

"We review a trial court's decision regarding the admissibility of evidence under an abuse of discretion standard." *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007) (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991)). Trial courts are in the best position to resolve questions of admissibility, therefore appellate courts will uphold a trial court's decision on

10

admissibility as long as the decision is not outside the "zone of reasonable disagreement." *Rodriguez v. State*, 203 S.W.3d 837, 841 (Tex. Crim. App. 2006); *Montgomery*, 810 S.W.2d at 391.

<h3 style="text-align:center">III. Analysis</h3>

**1. Device Data Reports/Detective Hilyar's Testimony**

Appellant argues that the trial court erred in admitting State's exhibits 79 and 80, the records of Appellant's text messages, because the texts were inadmissible as hearsay and admitting them violated Rule 404(b) of the Texas Rules of Evidence. *See* Tex. R. Evid. 404(b), 802. Exhibit 79 reflects text message exchanges retrieved from Appellant's phone. Exhibit 80 shows substantially the same text message exchanges retrieved from the phone of a known drug dealer. As noted above, these messages show that during the days preceding Sophia's death, Appellant was buying and attempting to buy various prescription and illicit drugs. Therefore, the evidence was relevant to the issues at trial. *See* Tex. R. Evid. 401.

**a. Hearsay Objection**

Evidence of the content of text messages on a cell phone may be inadmissible hearsay if there is no evidence that the declarant sent the messages. *See Black v. State*, 358 S.W.3d 823, 832 (Tex. App.—Fort Worth 2012, pet. ref'd). Appellant did not, however, make this particular objection to the trial court, and therefore has failed to preserve error regarding this argument. *See* Tex. R. App. P. 33.1(a)(1); *Golliday*

11

*v. State*, 560 S.W.3d 664, 668-71 (Tex. Crim. App. 2018) (discussing proper preservation of error and holding that the appellate complaint was not properly preserved). Even had Appellant made a timely objection challenging the lack of authentication of these text messages, such an objection would have been resolved in the State's favor. Text messages may be authenticated in multiple ways, including by circumstantial evidence. *See Tienda v. State*, 358 S.W.3d 633, 639-40 (Tex. Crim. App. 2012). Evidence before the trial court included circumstances that Appellant's cell phone was found in his bedroom, in a house he shared with only his mother and his two-year-old daughter. There is no indication in the record that the phone or the messages it contained belonged to either of the other occupants of the house. We conclude the trial court had ample evidence to show that the text messages were communicated by Roque.

Appellant's own text messages are not hearsay, as they are admissions by a party opponent. *See* Tex. R. Evid. 801(e)(2)(A); *Trevino v. State,* 991 S.W.2d 849, 852-53 (Tex. Crim. App. 1999) (holding that a defendant's own statements are not hearsay).

As to Caldwell's text messages to Appellant, they are hearsay. Tex. R. Evid. 801(d). Because these text messages reference Caldwell's own participation in illegal drug transactions, however, they tend to expose Caldwell to criminal liability. These statements also are supported by corroborating circumstances that indicate

12

their trustworthiness. Consequently, Caldwell's text messages fall within an exception to the rule that generally prohibits the admission of evidence that qualifies as hearsay. *See Woods v. State,* 152 S.W.3d 105, 112-13 (Tex. Crim. App. 2004); Tex. R. Evid. 803(24). Because Appellant's and Caldwell's text message statements constitute a hearsay exclusion and a hearsay exception, respectively, the trial court did not abuse its discretion by admitting State's exhibits 79 and 80.

### b. Appellant's Rule 404(b) Objection

The evidence of Appellant's drug transactions would have been inadmissible if it were "offered *solely* for proving bad character and conduct in conformity with that bad character." *Dabney v. State*, 492 S.W.3d 309, 317 (Tex. Crim. App. 2016) (emphasis added); Tex. R. Civ. P. 404(b)(1). This evidence was not, however, offered *solely* for that purpose. Instead, it was offered to rebut Roque's defensive theory, his defense of insanity, and for that reason we conclude that the evidence of the drug transactions at issue was admissible. *See Dabney*, 492 S.W.3d at 317; Tex. R. Evid. 404(b)(2).

Appellant has argued that because he did not offer evidence specific to intoxication, he did not open the door to this evidence simply by pleading insanity. We disagree. Appellant offered Dr. Gripon's testimony to support his insanity defense. This evidence of Appellant's alleged insanity therefore opened the door to the admissibility of extraneous evidence tending to rebut insanity, including

evidence of voluntary intoxication. *See Villanueva v. State*, No. 01-20-00303-CR, 2021 WL 2832974, at *11 (Tex. App.—Houston [1st Dist.] July 8, 2021 (no pet.) (mem. op.) (not designated for publication) (discussing the admissibility of evidence of voluntary intoxication to rebut an insanity defense under analogous facts).

We overrule Appellant's first issue.

## 2. Dallas Moreau's Testimony

At trial, Appellant objected to Moreau's testimony on the basis that Moreau was not qualified to testify regarding Appellant's sanity because Moreau's professional qualifications did not meet the statutory requirements set forth in article 46C.102 of the Texas Code of Criminal Procedure. Tex. Code Crim. Proc. Ann. art 46C.102(a)(1). Appellant also objected that Moreau was not a qualified expert under the Texas Rules of Evidence. Tex. R. Evid. 702. Appellant further contended that because Moreau could not render an opinion as to Appellant's sanity at the time of the offense, his testimony was irrelevant to any fact of consequence in the case. Therefore, Appellant argues, Moreau's testimony should have been disallowed in its entirety pursuant to Rules 401 and 402 of the Texas Rules of Evidence. Tex. R. Evid 401, 402.

In addressing the initial objection, the trial court relied on *Pham v. State* to decide that the cited portion of the Code of Criminal Procedure applies only to court-appointed experts. *See Pham v. State*, 463 S.W.3d 660, 670 (Tex. App.—Amarillo

14

2015, pet. ref'd); Tex. Code Crim. Proc. Ann. art. 46C.102(a). In *Pham*, a court-appointed neuropsychiatrist testified that the appellant was insane at the time of the offense. *Pham,* 463 S.W.3d at 665-66. To rebut that evidence, the State retained an expert who testified that the appellant was sane at the relevant point in time. *Id.* The appellant contended that the trial court erred in admitting the testimony of the State's retained expert because that expert's qualifications did not meet the statutory criteria. *Id*. at 667. In rejecting this argument, the *Pham* court noted that "the plain language of Article 46C.102 itself suggests that it applies only to court-appointed experts[.]" *Id*. at 669. Because Moreau was not a court-appointed expert, we conclude, as did our sister court, that the strict statutory criteria did not apply to Moreau's testimony. *See* Tex. Code Crim. Proc. Ann. art. 46C.102(a).

After implicitly overruling Appellant's initial objection to Moreau's qualifications, the trial court conducted a hearing outside the jury's presence to determine Moreau's expert qualifications pursuant to Rule 702 of the Texas Rules of Evidence. *See* Tex. R. Evid. 702. During this hearing, Moreau provided detailed testimony regarding his educational background, training, and clinical and forensic experience. In particular, he stated that he has both a bachelor's and a master's degree in clinical psychology, approximately forty years of clinical experience, and roughly ten years of experience doing substance abuse counseling for Jefferson and Orange Counties. Moreau also teaches psychology at a local college, and has

15

testified as a mental health expert on multiple occasions. Based on that information, the trial court determined that Moreau met the Rule 702 standard to testify as an expert. Tex. R. Evid. 702. Because Moreau's testimony enabled the trial court to find that Moreau was qualified "by knowledge, skill, experience, training, [and] education[,]" and that his "specialized knowledge [would] help the trier of fact to . . . determine a fact in issue[,]" the trial court did not abuse its discretion in permitting Moreau to testify as an expert. Tex. R. Evid. 702; s*ee Moreno v. State,* 619 S.W.3d 754, 760-61 (Tex. App.—San Antonio 2020, no pet.) (holding that a licensed professional counselor was a qualified expert witness under Rule 702).

Although the trial court precluded Moreau from testifying that Appellant was or was not legally sane at the time of Sophia's death, this evidentiary ruling does not render Moreau's testimony irrelevant. Moreau testified about Appellant's admissions and state of mind as of the day after Sophia's death. The jury was permitted to consider this evidence in weighing Appellant's insanity defense. *See Otis v. State*, No. 09-09-00140-CR, 2010 WL 1794932, at *3 (Tex. App.—Beaumont May 5, 2010, no pet.) (mem. op) (not designated for publication) (noting that a "jury may consider circumstantial evidence, including: the defendant's demeanor before and after the crime; . . . [and] the defendant's expressions of regret or fear, of the consequences of his actions; and any other possible explanations for the defendant's behavior.") (citing *Torres v. State,* 976 S.W.2d 345, 347-48 (Tex.

App.—Corpus Christi 1998, no pet.)). According to the rationale of *Otis*, Moreau's testimony was relevant because it included Appellant's demeanor after the crime and his expressions of regret at having killed Sophia. *Id*. The trial court did not err in admitting this evidence and we overrule Appellant's second point of error.

## 3. Harmless Error

Contrary to Appellant's implicit argument, the jury's verdict does not necessarily depend on the suggestion that Appellant was voluntarily intoxicated at the time of the offense. Instead, the jury, as fact finder, was empowered to reject Appellant's insanity defense regardless of evidence of sanity or voluntary intoxication. *See Villanueva*, 2021 WL 2832974, at *13 (addressing a jury's ability to reject an insanity defense). The burden of proving insanity fell to Appellant and the jury was authorized to determine whether Appellant had met his burden of proof by believing or disbelieving the evidence of insanity regardless of other evidence. *See Dashield v. State,* 110 S.W.3d 111, 115-16 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (addressing a jury's authority to disbelieve even uncontroverted evidence of insanity).

The record contains evidence that within mere hours of Sophia's death, Appellant was capable of stating that he had hit her with a hammer and that it would have been wrong to kill her. From this evidence, the jury could have inferred that, notwithstanding expert testimony to the contrary, Appellant knew at the time of the

17

offense that his conduct was wrong. *Id.*; *see also Bartel v. State*, No. 02-16-00020-CR, 2017 WL 1089689, at \*4 (Tex. App.—Fort Worth Mar. 23, 2017, no pet.) (mem. op) (not designated for publication) (holding that evidence of sanity was sufficient to enable the jury to reject the insanity defense). Therefore, although we conclude the trial court did not abuse its discretion in admitting any evidence, any error that may have occurred in admitting evidence of voluntary intoxication was harmless given the testimony that Appellant knew when the murder occurred that what he was doing was wrong. *See* Tex. R. App. P. 44.2(b).

## IV. Conclusion

Because the arguments Rogue relies on to support his issues lack merit, the trial court's judgment is affirmed.

AFFIRMED.

JAY WRIGHT
Justice

Submitted on January 26, 2023
Opinion Delivered November 29, 2023
Do Not Publish

Before Golemon, C.J., Horton and Wright, JJ.