

# NUMBER 13-20-00026-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

THE STATE OF TEXAS,                                                                Appellant,

v.

EDWARD JEROME HUFF,                                                              Appellee.

## ON APPEAL FROM THE 272ND DISTRICT COURT
## OF BRAZOS COUNTY, TEXAS

# MEMORANDUM OPINION

**Before Chief Justice Tijerina and Justices Cron and Fonseca
Memorandum Opinion by Justice Cron**

Appellee Edward Jerome Huff was convicted of unlawful possession of a firearm by a felon, a third-degree felony. *See* TEX. PENAL CODE ANN. § 46.04(a), (e). The trial court subsequently granted Huff's motion for new trial on the grounds of incompetency, ineffective assistance of counsel, and in the interest of justice. The State appealed.

Finding that the record raised a bona fide doubt about Huff's competency during

trial, we abated the appeal and remanded the case to the trial court to determine whether it was feasible to conduct a "retrospective competency inquiry given the passage of time, availability of evidence, and any other pertinent considerations." The trial court determined that it was feasible, and a retrospective competency evaluation was completed. Based on the results of that evaluation, the trial court concluded that Huff was competent to stand trial and that a formal retrospective competency trial was unnecessary. We reinstated the appeal and invited the parties to file supplemental briefs.

The remaining issue before us is whether the trial court abused its discretion by granting Huff a new trial in the interest of justice on his claims of ineffective assistance of counsel. Although we agree that some of counsel's complained-of conduct was constitutionally deficient, we disagree that Huff made the necessary showing of prejudice. Accordingly, we reverse the trial court's order and remand.[1]

## I. BACKGROUND

In September 2017, Huff, a convicted felon, displayed a firearm to a retired couple at Lake Bryan, near Bryan, Texas. According to Huff, he was going to spend the night in his car before going to a scheduled Veteran's Administration (VA) appointment in Bryan the next day. Huff was arrested later that evening.

In November 2017, Huff was indicted for unlawful possession of a firearm by a felon. *See id.* Specifically, the State alleged that Huff's conduct was illegal because he

---

[1] This appeal was transferred to us from the Tenth Court of Appeals in Waco pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. §§ 22.220(a) (delineating the jurisdiction of appellate courts), 73.001 (granting the supreme court the authority to transfer cases from one court of appeals to another at any time that there is "good cause" for the transfer). We are bound by the precedent of the transferring court to the extent that it conflicts with our own. *See* TEX. R. APP. P. 41.3.

possessed a firearm "at a location other than the premises at which [Huff] lived, to-wit: a motor vehicle." *See id.* § 46.04(a)(2). The State added two enhancement paragraphs, alleging that Huff was a habitual felony offender. *See id.* § 12.42(d). In a separate cause number, Huff was charged by information for the misdemeanor offense of disorderly conduct—displaying a firearm in a public place in a manner calculated to alarm. *See id.* § 42.01(8). After the charging instruments were filed, the State filed a "motion suggesting incompetency and request for examination," alleging in both cause numbers that Huff might be incompetent to stand trial. The trial court ordered Dr. Jennifer Rockett, a forensic psychologist, to evaluate Huff's competency to stand trial and to provide "[her] opinion on [Huff's] sanity at the time of the alleged offense."

Dr. Rockett issued two reports. In her first report, issued June 6, 2018, Dr. Rockett made the following observations and conclusions on Huff's sanity:

**Charge #1; Unlawful Possession of a Firearm by a Felon:**

Concerning the charge of unlawful possession of a firearm by a felon, [Huff's] reasoning for purchasing the weapon was based on his delusional belief that he was being targeted by people associated with his previous employers because he had filed a lawsuit against them. It is my professional opinion, however, that he did not know that purchasing the weapon was legally wrong, not due to his mental illness, but rather due to his possible (mis)understanding of the law (which does not appear to be based in delusion). The documents he provided for me to review appeared to have led him to believe that it was lawful for him to possess a firearm. Thus, it is my professional opinion that at the time of the offense of unlawful possession of a firearm by a felon, [Huff] was sane. That is, his knowledge of wrongfulness was impaired by a mistake of law (or an [in]accurate reading of the law) rather than because of a mental disease or defect.

**Charge #2; Disorderly Conduct by Display of a Firearm by a Felon:**

At the time of the offense, [Huff] appears to have been experiencing non-bizarre, persecutory delusions concerning efforts by his previous employers

3

to watch, follow, and record his activities, to create problems for him financially and with his living arrangements and stability, to place powder substances and bugs in his car and home to cause him injury and illness, and to run him off the road on two occasions. His motive for displaying his firearm appears to have been driven by his persecutory delusions. It appears that he felt he needed to protect himself from possible harm and make it known to the people he believed were following him that he had armed himself. Thus, it is my professional opinion that at the time of the offense of disorderly conduct by the display of a firearm by a felon, [Huff] was not sane[,] and his knowledge of wrongfulness was impaired by his delusional disorder and associated persecutory beliefs.

In her second report, issued June 26, 2018, Dr. Rockett concluded that Huff was competent to stand trial on the charge of unlawful possession of a firearm but incompetent to stand trial on the associated misdemeanor of disorderly conduct.

The parties disregarded the reports and agreed that Huff was incompetent to stand trial on both charges. The trial court ordered Huff to be committed to Austin State Hospital (ASH) for a period not to exceed 120 days for evaluation and to restore him to competency, if necessary. While committed, Huff was treated by psychiatrist Dr. Andrea Wright. In her report, Dr. Wright discussed Huff's delusional disorder and his competency to stand trial:

Despite his concerns with his current attorney, [Huff] reported that he did feel he could work with an attorney. He was able to give a detailed account of the events surrounding his arrest and reported that he had documents to support his defense strategy. [Huff] stated that he felt ready to move forward with his case.

The disparity between presentations is suspected to be due in part to [Huff's] access to the reports by Dr. Rockett and his current medical records at ASH. I believe that [Huff] was likely minimizing his paranoia as he realized the negative impact his adamant espousal of his persecutory beliefs had on his last competency evaluation. Of note, [Huff] would not allow me to obtain any collateral information from his mother, or any other source, which could indicate an ongoing and persistent guardedness.

4

Ultimately, his current competency to stand trial determination must be based on his current presentation in which he demonstrated an ability to rationally participate in his defense. However, there is concern that [Huff's] ability to show flexible reasoning will not persist once his case moves forward. Specifically, there is a possibility that [Huff] will once again demonstrate a rigidity of thinking which will render him unable to rationally assist in his defense. This is more likely to occur if his currently held belief regarding his parole time out date is determined to be inaccurate.

Yet, at this time there is no evidence that a psychotic disorder, such as delusional disorder, interfered with his ability to relate to me or assist in his defense.

The unlawful possession case proceeded to jury trial on September 10, 2019.[2] Huff's trial counsel informed the trial court that he believed Huff was competent to stand trial, and Huff testified in his own defense. Huff's counsel requested and received a jury charge instruction on necessity. However, the jury rejected the affirmative defense and found Huff guilty as charged. Huff elected for the trial court to assess punishment. The trial court found the enhancement paragraphs to be true and assessed punishment at twenty-five years' imprisonment, the minimum allowable sentence. *See id.* § 12.42(d).

The following week, the original trial judge called a hearing sua sponte and made the following statement:

After Edward Huff's jury trial, I was not comfortable with the outcome [the] more I thought about it over the weekend. And I'm afraid an injustice was done to Mr. Huff.

I think, after listening to his testimony, I truly believe that Mr. Huff was suffering from some kind of paranoid delusion during the few minutes out there at Lake Bryan. I believe that Mr. Huff believes that he's not suffering from a delusion, and I think he really believes his testimony. I believe that he does believe his testimony; however, I do not believe he was under attack or due to any lawsuits. All that is paranoia. It's not fact. I don't believe he was lying. I think he really believes, as he sits there today probably

---

[2] The record indicates that the misdemeanor charge against Huff remains pending.

5

believes, his story.

So I went back and read the reports of both ASH and Dr. Rockett. At ASH they found that he actually does suffer from a paranoid delusion related to these lawsuits he filed. That's in the report. Dr. Rockett also found that Mr. Huff suffers from a paranoid delusion believing he was under attack at the time of his actions out there at Lake Bryan.

Interestingly, Dr. Rockett further found him to be insane, which is something I had never heard before the trial. I knew that he had been found competent . . . on one case, incompetent on the other. Never heard that she found him to be insane when he pulled out the AR-15, which I believe to the jury was a very influential fact motivating them to convict, this big scary-looking rifle that was pulled out. And Dr. Rockett found he did not know right from wrong when he pulled that weapon.

I'm also concerned that the jury never heard anything about his paranoid delusion or any insanity out there.

So after evaluating the whole case in retrospect, I don't have any confidence in the outcome of this case or the rationale offered by Dr. Rocket[t] when she finds him to be insane on the misdemeanor but not insane on the felony when both alleged actions occurred during the same few minutes at Lake Bryan.

I would like to see him examined by a more experienced forensic mental expert. Maybe more than one.

I have appointed Mr. Thibodeaux to represent him in a motion for new trial or appeal, whatever he thinks is proper.

And I'm saying these things now in open court to notify both sides the way I feel about this thing. I think it [is] my obligation if I believe an injustice is done to make it known. So I'm doing that now. I want these concerns investigated and determined if they have any merit.

So that completes my purpose for holding this hearing. Thank all of y'all for coming.

The State filed a motion to recuse the original trial judge, and he agreed to recuse himself from the case. The Honorable Joseph Ann Ottis was assigned to the case.

In October 2019, Huff's appellate counsel filed a motion for new trial arguing that

6

Huff was incompetent during the trial, that he received ineffective assistance of counsel, and that either of these claims entitled him to a new trial in the interest of justice. In November 2019, the trial court held a hearing on the motion for new trial.

Trial counsel testified that he prepared for trial by relying on Dr. Wright's report, which indicated Huff was competent to stand trial.[3] Counsel said that Huff showed no signs of incompetency while he represented Huff. According to counsel, Huff was able to discuss the facts of the case and explain his reasoning behind some of the issues in the case without difficulty. Counsel described Huff as "[v]ery" intelligent. Counsel explained that his trial strategy was to use the fact that Huff believed people were following him to build a necessity defense. He did not pursue an insanity defense because he did not believe Huff's delusions reached a level of criminal insanity. He reached this conclusion based on his "years of experience" representing clients with mental illness and "[b]ecause [he] saw no indications of insanity that would meet the legal definition in this case."

However, counsel admitted that he did not read either of Dr. Rockett's reports, including her first report that opined that Huff was criminally insane at the time of the disorderly conduct offense.[4] Counsel also conceded that Huff's belief that unidentified individuals were "after him" was "not something that a normal person would have." For example, Huff told counsel before trial that he believed that someone working on behalf of his former employers "was following him" and "trying to cause him harm" because Huff

---

[3] Huff filed a motion asking us to take judicial notice of the fact that trial counsel passed away in June 2020. We grant the motion and take judicial notice of counsel's death.

[4] Prior to the hearing, the State filed a *Brady* notice disclosing the same fact. Trial counsel apparently met with the State after the motion for new trial was filed and disclosed to the prosecutor that he had not read the Rockett reports.

had initiated litigation against the former employers.

Counsel additionally conceded that, despite knowing that Dr. Wright had diagnosed Huff with delusional disorder, persecutory type, he never consulted the Diagnostic and Statistical Manual of Mental Disorders (DSM) to learn about "the specific DSM criteria for that specific mental illness," even though this diagnostic tool was available to him. As read into the record, the DSM states that, in terms of everyday functionality, "the impairment is usually more circumscribed than that seen with other psychotic disorders." Lastly, counsel acknowledged that he never discussed the possibility of raising an insanity defense with Huff, and consequently, he never requested an insanity evaluation or hired a psychiatrist to evaluate Huff's mental condition at the time of the offense.

David Barron testified that he was appointed to represent Huff in September 2017.[5] However, he withdrew in November 2018, and he was replaced by trial counsel. According to Barron, he suggested to Huff that they present an insanity defense, but Huff rejected the idea. The "major reason" Barron withdrew was Huff's refusal to present an insanity defense. Barron opined that insanity was the only viable defense available to Huff.

Dr. John Fabian, a psychologist hired by Huff, stated in a supporting affidavit that an insanity defense "may have been viable." He testified more assertively during the hearing, opining that an insanity defense "[c]ertainly" would have been "viable." He clarified, though, that his opinion was based on his review of the trial transcript and the

---

[5] The State has notified us in a brief that Barron passed away in July 2021. On our own motion, we take judicial notice of his death.

8

Rockett and ASH reports and that he had not been retained to perform a sanity evaluation on Huff. He further opined that some of Huff's responses at trial, when viewed in conjunction with the ASH and Rockett reports, should have triggered a competency inquiry.

Huff's mother, Shirley Huff, testified that Huff stayed with her in Florida for approximately a month in the summer of 2017. It was during this Florida trip that Huff purchased the firearm at issue. Shirley had not seen her son in ten years. She said that, although it was not apparent at first, Huff began displaying odd behavior and was "not the same" person anymore. For example, she said that Huff "was always looking over his back because he said they were following him," but he believed he was safe "at his mom's house" because "they couldn't come in [her] yard." It is undisputed that, despite having her contact information, trial counsel did not attempt to contact Shirley as part of his investigation.

Finally, although present at the hearing, Huff did not testify. In a supporting affidavit attached to his motion for new trial, Huff stated that his meetings with trial counsel before and during trial were limited and that counsel never discussed an insanity defense with him during any of those meetings. Huff does not state in his affidavit that, had counsel suggested such a defense, he would have agreed to the strategy. Huff attempted to introduce the affidavit into evidence during the hearing, but the trial court sustained the State's hearsay objection, and Huff does not challenge that ruling on appeal.

The trial court ultimately granted the motion for new trial on the grounds of

9

incompetence, ineffective assistance of counsel, and in the interest of justice.[6] This appeal followed. *See* TEX. CODE CRIM. PROC. ANN. art. 44.01(a)(3) (permitting the State to appeal an interlocutory order granting a new trial).

As noted, we previously abated the appeal and remanded the case to the trial court to determine the feasibility of a retrospective competency evaluation. *See Turner v. State*, 422 S.W.3d 676, 696 (Tex. Crim. App. 2013); *Bautista v. State*, 605 S.W.3d 520, 530 (Tex. App.—Houston [14th Dist.] 2020, no pet.). Finding it feasible, the trial appointed psychologist Dr. Antoinette McGarrahan to conduct the evaluation.

Dr. McGarrahan reviewed the entire appellate record and conducted a current mental status examination of Huff. Dr. McGarrahan ultimately concluded that although Huff "may have suffered from mental illness (namely[,] a delusional disorder) at the time of his trial," he "was competent to stand trial" because the record reflected that "Huff did have sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and that "Huff did have a factual and rational understanding of the proceedings against him." Dr. McGarrahan found Huff's testimony during both phases of trial to be "the most compelling basis" for her opinion, noting that Huff "testified relevantly, rationally, and coherently without interference of mental health symptoms." Regarding Huff's capacity to engage in a reasoned choice of legal strategies, Dr. McGarrahan stated:

> The mere fact that he would not entertain an insanity defense or take a plea offer is not inherently irrational or reflective of incompetency. Nor is the fact

---

[6] Huff's motion also contained constitutional challenges to Texas Rule of Appellate Procedure 21, which establishes a 30-day deadline for filing a motion for new trial. *See* TEX. R. APP. P. 21.4(a). The gist of his argument was that the short deadline creates a procedural hurdle to filing an adequate ineffective assistance claim, thereby forcing defendants to raise the claim in a subsequent habeas proceeding, even though they are not entitled to appointed counsel in such proceedings. In its order granting the motion, the trial court expressly found those grounds moot, and they are not at issue in this appeal.

that Mr. Huff requested that he be appointed new counsel. Mr. Huff explained his reasoning behind these decisions, which reflected logical reasoning and consideration of what the long-term ramifications would be on his life if found insane or having pleaded guilty to another felony. Simultaneously, he knew the risk of taking his case to trial. He understood that there were no ideal options in his situation. His decisions with respect to strategy were thought[-]out and in sync with his trial attorney's affirmative defense approach according to information put on the record during the trial.

Based on the results of Dr. McGarrahan's evaluation, the trial court determined that Huff was competent at the time of trial and that a formal retrospective competency trial was unnecessary. We reinstated the appeal and invited the parties to file supplemental briefs in view of the proceedings below. Both parties filed supplemental briefs focused solely on the ineffective assistance claims. Huff concedes that the competency ground is no longer viable and asks us to affirm on the ineffective assistance grounds.

## II.    STANDARD OF REVIEW & APPLICABLE LAW

A trial court's decision to grant a new trial is reviewed for an abuse of discretion. *State v. Thomas*, 428 S.W.3d 99, 103 (Tex. Crim. App. 2014). Generally, a trial court abuses its discretion when it acts without reference to any guiding rules or principles. *Id.* In conducting our analysis, we "view the evidence in the light most favorable to the trial court's ruling, defer to the court's credibility determinations, and presume that all reasonable fact findings in support of the ruling have been made." *Id.* at 104. "The mere fact that a trial court may decide a matter differently from an appellate court does not demonstrate an abuse of discretion." *Id.* at 103–04.

Texas Rule of Appellate Procedure 21.3 provides a non-exhaustive list of grounds that require a new trial. *See* TEX. R. APP. P. 21.3; *State v. Herndon*, 215 S.W.3d 901, 909

11

(Tex. Crim. App. 2007) (explaining that the "list is illustrative, not exclusive"). A trial court may also grant a new trial "in the interest of justice," as occurred here. *See Herndon*, 215 S.W.3d at 906 (reaffirming "in the interest of justice" as an independent ground for granting a new trial and tracing its origin to an 1873 opinion). "[B]ut 'justice' means in accordance with the law." *Id.* at 907. A trial court "cannot grant a new trial on mere sympathy, an inarticulate hunch, or simply because he personally believes that the defendant is innocent or 'received a raw deal.'" *Id.* "To grant a new trial for a non-legal or legally invalid reason is an abuse of discretion." *Id.*

Conversely, "a trial court has wide discretion in ruling on a motion for new trial which sets out a valid legal claim." *Id.* at 908. We will not disturb a trial court's decision to grant a new trial in the interest of justice if the defendant: "(1) articulated a valid legal claim in his motion for new trial; (2) produced evidence or pointed to evidence in the trial record that substantiated his legal claim; and (3) showed prejudice to his substantial rights under the standards in Rule 44.2 of the Texas Rules of Appellate Procedure." *Id.* at 909. "The defendant need not establish reversible error as a matter of law before the trial court may exercise its discretion in granting a motion for new trial." *Id.* Instead, granting a new trial is within the trial court's discretion if "the defendant demonstrates that his first trial was seriously flawed and that the flaws adversely affected his substantial rights to a fair trial." *Id.*

Ineffective assistance of counsel is a valid legal claim that may support a motion for new trial in the interest of justice. *Thomas*, 428 S.W.3d at 107. The right to reasonably effective assistance of counsel is enshrined in both the United States Constitution and

the Texas Constitution. *See* U.S. CONST. amend. VI; TEX. CONST. art. I, § 10; *see also* TEX. CODE CRIM. PROC. ANN. art. 1.051. To establish an ineffective assistance claim, the defendant must first demonstrate, "by a preponderance of the evidence, that trial counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms." *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). Because there "are countless ways to provide effective assistance in any given case," a reviewing court must be highly deferential and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland v. Washington*, 466 U.S. 668, 689 (1984) (quotation marks and citation omitted). To overcome this presumption, "[a]ny allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

The defendant must also demonstrate that he was prejudiced by his counsel's deficient performance. *Strickland*, 466 U.S. at 693. This second prong of the analysis is satisfied by showing a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In conducting our analysis, we consider the totality of the evidence before the factfinder. *Id.* at 695. Notably, this is a more difficult burden to meet than the harm analysis under Texas Rule of Appellate Procedure 44.2. *Ex parte Martinez*, 330 S.W.3d 891, 903 (Tex. Crim.

13

App. 2011); *see* Tex. R. App. P. 44.2(a) ("If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment."). Therefore, when a trial court grants a new trial "in the interest of justice," and the legal claim underpinning that decision is ineffective assistance of counsel, we review prejudice under *Strickland*, not Rule 44.2(a).

## III.  ANALYSIS

Of the grounds on which the trial court granted the motion for new trial, only two remain, and they are actually one and the same—in the interest of justice based on ineffective assistance of counsel. *See Thomas*, 428 S.W.3d at 107. Huff claimed that his counsel was ineffective for two reasons: (1) counsel failed to conduct a proper investigation into raising an insanity defense; and (2) counsel elicited testimony from Huff about his paranoid delusions that undercut Huff's necessity defense. As to the first ground, although we agree with the trial court that counsel's failure to thoroughly investigate Huff's mental health history was constitutionally deficient, we disagree that Huff made a sufficient showing of prejudice. Similarly, even if we assume that counsel's questions during trial were misguided and below an objective standard of reasonableness, Huff has not demonstrated that, but for counsel's questions, the outcome of his trial would have been different.

14

**A.      Failure to Investigate Insanity Defense**

**1.      Duty to Investigate**

Trial "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. When counsel is aware of information that would lead a reasonable attorney to investigate the possibility of raising an insanity defense, counsel's failure to conduct such an investigation renders their representation ineffective. *Ex parte Imoudu*, 284 S.W.3d 866, 870 (Tex. Crim. App. 2009). This investigation may include gathering available mental health records and seeking a professional assessment of the client. *Id.* at 869–70.

Trial counsel testified that his decision not to investigate an insanity defense was based on his lay opinion that Huff was not criminally insane at the time of the incident. In reaching this conclusion, counsel relied on his interactions with Huff and his prior experience representing other clients with mental illnesses. Therefore, we look to whether his decision not to investigate an insanity defense was reasonable under the circumstances. *See Strickland*, 466 U.S. at 691.

We conclude that counsel's decision not to explore the possibility of an insanity defense was unreasonable for several reasons. First, his decision was uninformed. Both the United States Supreme Court and the Texas Court of Criminal Appeals have looked to the American Bar Association's Criminal Justice Standards when evaluating whether

15

trial counsel's lack of investigation was reasonable under the circumstances. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Ex parte LaHood*, 401 S.W.3d 45, 50 (Tex. Crim. App. 2013). Those standards state that defense counsel has "a duty to be well-informed regarding the legal options and developments that can affect a client's interests during a criminal representation." ABA Criminal Justice Standards for the Defense Function, Continuing Duties of Defense Counsel 4–1.3(e) (4th ed. 2017). They also provide that "investigative efforts should commence promptly and should explore appropriate avenues that reasonably might lead to information relevant to the merits of the matter." *Id.* Duty to Investigate and Engage Investigators 4–4.1(c). This includes "efforts to secure relevant information in the possession of the prosecution, law enforcement authorities, and others." *Id.*

Here, counsel admitted that he was "unaware" that Dr. Rockett had conducted a sanity evaluation because he was "under the mistaken impression that her examination was [only] on competency." Counsel claimed that "the only thing [he] had been advised of was the competency/incompetency evaluation." And he implied through his testimony that since Huff had been restored to competency at ASH, he did not deem it necessary to seek out the earlier competency evaluation, acknowledging that he "never actually read" it. Of course, Huff's competency to stand trial and his sanity at the time of the offense are distinct legal issues, and just because Huff was eventually competent to stand trial does not necessarily mean that he was sane at the time of the offense. *See Pham v. State*, 463 S.W.3d 660, 669 (Tex. App.—Amarillo 2015, pet. ref'd) (explaining that, although the "two issues share some similar considerations, they remain two distinct legal

16

concepts with distinctive definitions, procedures, and consequences"). In any event, the trial court's April 25, 2018 "Order for Examination Regarding Incompetency" expressly required Dr. Rockett to conduct *both* a competency evaluation *and* to "state [her] opinion on [Huff's] sanity at the time of the alleged offense." We conclude that it was unreasonable for counsel to rely exclusively on his lay opinion about Huff's sanity when it was apparent from the face of the clerk's record that an insanity evaluation had already occurred. At a minimum, counsel had a duty to obtain and read the report before deciding not to investigate a possible insanity defense. *See Rompilla*, 545 U.S. at 383 (counsel's failure to review a relevant file that was readily available constituted an unreasonable investigation); *Ex parte Imoudu*, 284 S.W.3d at 870 (counsel's failure to request available jail records that would have shown applicant was suffering from mental health problems constituted an unreasonable investigation).

Relatedly, counsel acknowledged that, although he was aware that Dr. Wright had diagnosed Huff with delusional disorder, persecutory type, he never consulted the DSM to educate himself about "the specific DSM criteria for [Huff's] specific mental illness." These criteria, which were read into the record at the motion for new trial hearing, include a delusion that "involves the individual's belief of being conspired against, cheated, spied on, followed, poisoned, maliciously maligned, or harassed or obstructed in the pursuit of long-term goals." Counsel admitted that the DSM was available to him and that Huff displayed many of these criteria during their interactions, a fact we discuss in more detail below. And had counsel consulted the DSM, he would have also known that, in terms of everyday functionality, Huff's "impairment is usually more circumscribed than that seen

17

with other psychotic disorders," a fact that would have informed counsel's impression of Huff's mental disorder. Without an informed understanding of Huff's mental disease, whether from the DSM or some other available source, it is difficult to see how counsel could have made a reasoned decision not to investigate an insanity defense.

Next, counsel's decision not to investigate an insanity defense is inconsistent with what he knew about Huff's mental health history. *See Bouchillon v. Collins,* 907 F.2d 589, 597 (5th Cir.1990) ("It must be a very rare circumstance indeed where a decision not to investigate [an insanity defense] would be 'reasonable' after counsel has notice of the client's history of mental health problems."). Beyond his knowledge that Huff had been diagnosed with a psychiatric disorder that put his competency to stand trial at issue, counsel knew from Dr. Wright's report that she had recommended antipsychotic medication but that "Huff refused the medication" because he did not believe that he suffered from mental illness. Dr. Wright also expressed her "concern" that Huff was "likely minimizing" his symptoms because "he realized the negative impact his adamant espousal of his persecutory beliefs had on his last competency evaluation" and that Huff's "ability to show flexible reasoning will not persist once his case moves forward." Dr. Wright likewise noted a "disparity between presentations" in her evaluation and Dr. Rockett's evaluation, yet counsel acknowledged that he "never actually read" either of Dr. Rockett's reports.

Finally, based on his own interactions with Huff, counsel conceded that Huff's belief that unidentified individuals were "after him" was "not something that a normal person would have." Prior to trial, Huff explained to counsel his belief that someone

18

working on behalf of his former employers "was following him" and "trying to cause him harm" because Huff had initiated litigation against the former employers. Huff provided counsel with specific examples of these incidents, including Huff's belief that someone tried to "poison" him through air conditioning vents in his home, vehicle, and later a motel room. *See Ex parte Imoudu*, 284 S.W.3d at 870 (concluding that, among other evidence, counsel's observation of applicant's "odd" and "bizarre behavior" should have "indicate[d] that [a]pplicant may have been insane at the time of the offense—at least enough to look into it"). Counsel also knew that these delusions motivated Huff to purchase the firearm while he was visiting his mother. It is noteworthy that, despite knowing the foregoing information, counsel did not attempt to contact Huff's mother to ask her about Huff's state of mind when he purchased the firearm. Based on her testimony, she would have confirmed that Huff was expressing paranoid delusions at the time of the purchase. *See Ex parte LaHood*, 401 S.W.3d at 51 (citing counsel's failure to contact family members about a client's mental health history as evidence of an inadequate investigation).

After reviewing the quantum of evidence known to counsel before trial, as well as the information that should have been known to counsel, we conclude that counsel's failure to investigate an insanity defense was unreasonable under the circumstances. *See Strickland*, 466 U.S. at 691.

### 2. No Prejudice

To prevail on his ineffective assistance claim, Huff must also demonstrate that he was prejudiced by his counsel's deficient performance. *See Strickland*, 466 U.S. at 693. We conclude that Huff failed to prove prejudice for two reasons.

19

First, there is no evidence in the record that, had counsel investigated and recommended an insanity defense, Huff would have followed counsel's advice. In *Ex parte Imoudu*, a case cited by Huff, the applicant made the following claims in an affidavit:

> The lawyers did not discuss an insanity defense with me. Had they hired a psychiatrist to evaluate me, the psychiatrist concluded that I was insane at the time of the offense, and the lawyers explained the insanity defense to me, I would have rejected the plea bargain, pled not guilty by reason of insanity, and gone to trial.

284 S.W.3d at 870. There is no such evidence in this record. On the contrary, the evidence in the record indicates that Huff was aware of the possibility of raising an insanity defense but was firmly opposed to the idea. According to Dr. Wright's report, Huff had read Dr. Rockett's first report and was aware of Dr. Rockett's opinion that he was criminally insane at the time of the disorderly conduct offense. After Huff's competency had been restored at ASH, Barron advised Huff to raise an insanity defense in his felony case, and it was the fallout from their disagreement over pursuing this defense that led Barron to withdraw as Huff's counsel. Thus, unlike the defendant in *Ex parte Imoudu*, Huff had already considered and rejected an insanity defense. *See id.*

Further, there is no affirmative evidence in the record that, had counsel also advised Huff to raise an insanity defense, Huff would have reconsidered and "pled not guilty by reason of insanity." *See id.* Huff did not testify at the evidentiary hearing, and although he attempted to admit his supporting affidavit, the trial court sustained the State's hearsay objection, and Huff has not challenged that ruling on appeal. Consequently, his affidavit is not part of the evidentiary record. *See Scaggs v. State*, 18 S.W.3d 277, 281 (Tex. App.—Austin 2000, pet. ref'd) ("Motions for new trial and affidavits

20

and controverting affidavits are mere pleadings unless offered and admitted in evidence."); *see also Sanchez v. State*, No. 03-19-00437-CR, 2021 WL 2672038, at *2 (Tex. App.—Austin June 30, 2021, no pet.) (mem. op., not designated for publication) (same).

Even if we could consider it, Huff's affidavit falls short of the affidavit that supported a finding of prejudice in *Ex parte Imoudu*. Although Huff stated in his affidavit that he and trial counsel never discussed an insanity defense, unlike the applicant in *Ex parte Imoudu*, Huff never affirmatively stated that he would have gone forward with an insanity defense if counsel had advised him to. *See Ex parte Imoudu*, 284 S.W.3d at 870. Any implied finding that Huff would have reconsidered his position had counsel also recommended an insanity defense is mere speculation. Simply put, there is no reasonable possibility that the outcome of the trial would have been different without an affirmative showing that Huff would have agreed to an insanity defense in the first instance. *See Strickland*, 466 U.S. at 694; *Ex parte Imoudu*, 284 S.W.3d at 870.

When this case was first argued to us, Huff suggested that his incompetency prevented him from engaging in a reasoned choice of legal strategies. If true, this could have possibly excused his previous rejection of the insanity defense. However, given the outcome of the retrospective competency evaluation, Huff now concedes that he is not entitled to a new trial based on incompetence. Thus, the State's issues regarding competency are moot. *See Turner v. State*, 570 S.W.3d 250, 263 (Tex. Crim. 2018) ("Given the jury's verdict that Appellant was competent to stand trial, the points of error related to competency in his original brief are now moot."). And we accept as true Dr.

21

McGarrahan's conclusion that Huff previously rejected the insanity defense based on a rational concern about the collateral consequences of potentially being found criminally insane.

Second, the record does not establish that "the insanity defense would have been validly raised and likely to succeed at trial." *Ex parte Imoudu*, 284 S.W.3d at 870; *see Hill v. Lockhart*, 474 U.S. 52, 60 (1985) (explaining that "where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial"). The insanity defense in Texas is narrow. *See Ruffin v. State*, 270 S.W.3d 586, 593 (Tex. Crim. App. 2008) (explaining that, unlike some other jurisdictions, Texas does not have a "diminished responsibility" or "diminished capacity" defense). Even if there is a significant causal link between a person's mental disease and their commission of an offense, so long as the person appreciated that their conduct was wrong or illegal at the time of the offense, they are not entitled to an insanity instruction. *Id.* at 592; *see Kelly v. State*, 195 S.W.3d 753, 757 (Tex. App.—Waco 2006, pet. ref'd) ("Evidence of mental disease or defect does not, standing alone, equate to evidence of insanity."). Stated differently, a person who appreciates right from wrong while committing a criminal offense but feels morally justified in their actions because of a mental disease is not entitled to an insanity defense. *Ruffin*, 270 S.W.3d at 592.

Here, the evidence was sufficient to establish that Huff's paranoid delusions motivated him to purchase the gun. He irrationally believed that someone was out to get him, and he therefore needed a gun to protect himself. But that is not the test to determine

22

whether Huff was criminally insane at the time of the offense. Instead, we must look for evidence in the record that, due to his "severe mental disease or defect, [Huff] did not know that his conduct was wrong." TEX. PENAL CODE ANN. § 8.01(a); *see Ruffin*, 270 S.W.3d at 592. We have found none.

In *Ex parte Imoudu*, the habeas applicant hired a psychiatrist who opined by affidavit that the applicant "was suffering from untreated schizophrenia, was unable to discern right from wrong, and was insane at the time of the offense." 284 S.W.3d at 871. This record lacks similar affirmative evidence of insanity. Huff's retained expert, Dr. Fabian, expressly testified that he had not evaluated Huff's sanity at the time of the offense, saying only that, from his review of the record, he believed it was a "viable" defense. In explaining his conclusion, Dr. Fabian said that the record reflected that Huff's decision to purchase the firearm was "fueled by irrational persecutory delusions." But Huff's irrational justification for purchasing the firearm is not probative as to whether Huff was criminally insane at the time of the offense. *See Ruffin*, 270 S.W.3d at 592. Conversely, Dr. Fabian also acknowledged that there is affirmative evidence in the record that Huff "had knowledge of wrongfulness or some legal consequence of purchasing a gun in the first place." Indeed, Huff testified during the guilt-innocence phase that he knew it was illegal for him to possess a firearm for five years after his release from prison and that he purchased the firearm because "it was beyond the five-year anniversary of [his] parole." He also testified during the punishment phase that he mistakenly believed he could lawfully possess a firearm, regardless of whether it was on his premises or elsewhere, because his right to vote had been restored in Texas. In other words, just as

23

Dr. Rockett had originally concluded, the record before us indicates that Huff's unlawful possession of a firearm was rooted in a mistake of law, not his inability to appreciate right from wrong.

Unlike the retained expert in *Ex parte Imoudu*, Dr. Fabian never affirmatively stated that Huff's mental disease prevented him from appreciating that it was illegal for him to possess a firearm outside the premises where he lived. *See* 284 S.W.3d at 871; TEX. PENAL CODE ANN. § 46.04(a)(2); *Conrad v. State*, 77 S.W.3d 424, 426 (Tex. App.—Fort Worth 2002, pet. ref'd) (finding failure to investigate deficient but concluding appellant failed to show prejudice because "there was no evidence offered at the hearing on the motion for new trial that any physician or social worker would have testified that [defendant] was legally insane at the time of the offense"). Based on this record, Huff would not have been entitled to an insanity instruction. The most Huff could have hoped for by raising such a defense was jury nullification. While certainly possible, such an outcome is too speculative to sustain an ineffective assistance claim. *See Strickland*, 466 U.S. at 695 ("The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision."); *Miller v. State*, 548 S.W.3d 497, 513 (Tex. Crim. App. 2018) (Alcala, Judge, dissenting) (explaining that "actual prejudice is considered under an objective standard rather than being based on speculation about the possibility of jury nullification or some other extreme event"). We conclude that there is no evidence that "the insanity defense would have been validly raised and likely to succeed at trial." *Ex parte Imoudu*, 284 S.W.3d at 870. Therefore, even under our deferential standard of

review, the trial court abused its discretion by impliedly finding that Huff met the second *Strickland* prong on his failure-to-investigate claim.

**B.      Counsel's Questions Did Not Sabotage Huff's Necessity Defense**

Huff also claimed his counsel was ineffective by asking him about his paranoid delusions at the end of the guilt-innocence phase of trial. Counsel's trial strategy was to raise a necessity defense, which required Huff to admit to the illegal conduct, *see Juarez v. State*, 308 S.W.3d 398, 406 (Tex. Crim. App. 2010), and required some evidence in the record demonstrating, among other things, that Huff reasonably believed his conduct was immediately necessary to avoid imminent harm. *See* TEX. PENAL CODE ANN. § 9.22(1); *Maciel v. State*, 631 S.W.3d 720, 723 (Tex. Crim. App. 2021) ("A defense is supported (or raised) by the evidence if there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that that element is true."). "'Reasonable belief' means a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." TEX. PENAL CODE ANN. § 1.07(a)(42).

Huff claims that, by asking him during redirect whether he was suffering from paranoid delusions at the time of the offense, counsel undermined the reasonableness of his belief that his conduct was immediately necessary to avoid imminent harm. Although Huff received a necessity instruction, he claims that he was harmed because the jury was originally deadlocked by a vote of 9–3 but eventually returned a guilty verdict after receiving an *Allen* charge. The record reflects that two of the jurors were crying when the verdict was delivered. Huff suggests that, without the improper questions hamstringing

25

his necessity defense, the trial would have likely resulted in a hung jury. We conclude that, even if counsel's questions were inappropriate, Huff has failed to show prejudice because the State had already vigorously cross-examined Huff on the same subject matter. As such, any effect counsel's additional questions may have had on the jury's verdict was de minimis.

Huff testified in his own defense and laid out his reasoning for purchasing the firearm. Huff described a series of events that occurred after he sued his former employers and that caused him to fear for his safety. These included "particles" coming from air conditioning vents in his apartment, in his car, and later in his motel room that caused unexplained and persistent skin irritation; someone breaking into his motel room; vehicles following him; two men following him around a CVS, which he reported to police; and someone breaking into another motel room where Huff was staying and going through his things, which Huff also reported to police. At this point, Huff decided to leave the area and go to his mother's home in Florida. On the way there, he had a blowout even though he had just purchased a new set of tires. According to Huff, police officers who responded to the scene told him that someone had tampered with his tire. Finally, Huff described an incident where someone ran him off the road while he was in Florida. Based on these events, Huff believed that he needed a firearm to protect himself and purchased one at a gun show in Florida.

Huff returned to Texas to go to a scheduled VA appointment and was living in his vehicle at the time. He described the events that caused him to brandish the weapon at Lake Bryan. It began when a vehicle honked at him at a four-way stop and then followed

26

him into the park. Once inside the park, Huff lost sight of the vehicle, but then it reappeared while Huff was standing outside of his vehicle admiring the lake. As the vehicle approached him, Huff thought it was traveling at an unusually slow speed. Concerned for his safety, Huff grabbed the firearm from his vehicle and stood with it by his side as the vehicle passed him by. He claimed he never pointed the weapon and that it was unloaded.

Predictably, the State extensively cross-examined Huff about the reasonableness of his belief that (as the State put it) someone was "out to get him." *See Mays v. State*, 318 S.W.3d 368, 383 (Tex. Crim. App. 2010) ("Mental disease is not an attribute of the reasonable, ordinary and prudent person. Thus, although the general rule is that the jury must determine the relative credibility of the evidence raising a 'reasonable belief' about a fact, reliance upon paranoid beliefs and delusions negates the type of reasonableness that an ordinary and prudent person would have under the circumstances."). At one point, the State pointedly asked Huff whether he appreciated the fact that he could be perceived as "paranoid." This theme of Huff's "paranoia" was persistent throughout the cross-examination.

Before redirect began, counsel initiated a bench conference to discuss whether the State had "opened the door" to an insanity defense by "talking about paranoia or mental illness."[7] Counsel explained that he wanted to ask Huff whether he believed that his actions were right, even though they may have been wrong under Texas law, and potentially ask for an insanity instruction. The State objected on the basis that Huff failed

---

[7] The trial court had previously granted the State's motion in limine, which included any mention of Huff's mental disease.

27

to provide notice of the defense. The trial court overruled the objection, and counsel asked Huff the following questions:

> [Counsel]: Now, the prosecutor has brought up things saying, basically, that he thinks that your thought processes . . . show that you were paranoid on that day. So let me ask you, did you believe beyond anything that your actions on that day were right? Whether they were legally right or not, do you believe that what you did was right in possessing a firearm to protect yourself?
>
> [Huff]: Yes, sir.
>
> [Counsel]: Even if that was due to a level of paranoia that is not normal?
>
> [Huff]: Can you explain? Can you define "paranoia"? Can you explain "not normal"?
>
> [Counsel]: I'm just asking you. He brought up things that your actions in believing that somebody is out to get you indicates paranoia, didn't he?
>
> [Huff]: That's what he stated, yes, sir.
>
> . . . .
>
> [Counsel]: If the question were to be submitted concerning whether or not you suffer from a mental disease or defect that made it to where you believed you couldn't tell the difference between right or wrong, you believed you were right even though under Texas law you were wrong, would that be an accurate statement?
>
> [Huff]: At the time I believed I was within the law.

Both parties rested, and counsel conceded during the charge conference that Huff was not entitled to an insanity instruction based on the evidence in the record: "I don't think I was able to meet the requirement, Judge." The trial court agreed. The State argued that Huff was also not entitled to a necessity instruction because there was no evidence

28

of imminent harm. The State did not argue under *Mays* that Huff's paranoid delusions precluded a necessity instruction. *See* 318 S.W.3d at 383. Labeling it a "close" call, the trial court allowed it, and the jury was instructed on necessity. During closing arguments, the State emphasized, as it had during cross-examination, that Huff "was not justified in having that firearm because of this paranoid belief that everyone's out to get him."

In arguing that counsel "sabotaged" his necessity defense by asking the above questions, Huff fails to acknowledge that the State had already made the same point repeatedly during his cross-examination. In truth, the die was cast when counsel and Huff decided to raise a necessity defense based on Huff's paranoid delusions. If anything, counsel's belated attempt to pivot to an insanity defense only reinforces our conclusion that his failure to investigate insanity pretrial was unreasonable. But Huff has not shown, but for counsel's allegedly improper questions, there is a reasonable probability that the result of the trial would have been different. *See Strickland*, 466 U.S. at 694. We sustain the State's remaining issue.

## IV. CONCLUSION

We reverse the trial court's order granting a new trial and remand for further proceedings consistent with this memorandum opinion.

JENNY CRON
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
23rd day of October, 2025.